### COMMONWEALTH of Pennsylvania, Appellee,

v.

### John WALLACE, Appellant.

Superior Court of Pennsylvania.

Submitted July 22, 2002.

Filed Nov. 21, 2002.

Reargument Denied Dec. 30, 2002.

Charles A. Banta, Easton, for appellant.

James B. Martin, Assistant District Attorney, Allentown, for Commonwealth, appllee.

Before: LALLY–GREEN, BENDER and CAVANAUGH, JJ.

BENDER, J.:

¶ 1 John Wallace (Appellant) appeals from the judgment of sentence entered following his conviction at a bench trial of eight counts of endangering the welfare of children (EWOC). We affirm.

¶ 2 Based on the evidence presented, the trial court set forth the following recitation of the facts:

A review of the testimony presented at trial reveals that on November 30, 2000, Officer Ramon Rivera of the Allentown Police Department responded to 1714 West Tremont Street for a reported domestic disturbance. When he arrived, Officer Rivera encountered Faith Wallace, one of the defendant's teenage children, standing outside the home with a younger child, claiming that her mother, Margaret, would not stop spanking the child. Because it was windy and cold outside, Officer Rivera asked Faith if they could talk inside, and they entered the residence. Officer Rivera testified that he "was in for a surprise" when he entered the home, and said that he observed a very dirty home with young children everywhere, open containers of food, fleas, and flies. There was a foul odor in the air and the deteriorated roof, which was covered with a tarp had resulted in leaks that had caused most of the kitchen floor to rot away. Officer Rivera said that Mr. Wallace told him the roof had been leaking for five years. Because of the conditions he observed, Officer Rivera called Children and Youth Services[1] and a Housing Code Inspector to respond to the scene, and then continued to go through the house.

Officer Rivera testified that he went through the entire house, but that he had to go outside to get fresh air a few times because he "felt like vomiting" because of the foul odor. There were food and dirt stains on the walls and fleas and flies in the air. Officer Rivera indicated that "[t]here was food on the walls. Food on the ceilings. The kitchen was totally destroyed. The ceilings were gone. The floor was gone." Boxes were piled in all the rooms, and "[t]he stove had things stacked on top of it. The food inside [the refrigerator] was in a spoiled condition. The freezer was open. There was no door on it."

Joseph Holler, a Code Inspector for two years who had inspected hundreds of houses, responded to the scene and spent eight hours in the home on November 30, 2000 to determine if it was habitable. After working through a code checklist on that day and returning

---

1. The children were removed from parental care by the Lehigh County Office of Children and Youth Services (CYS) and were adjudicated dependent on December 11, 2000. *See*

*Commonwealth v. J.W. and M.W.*, 2002 Pa.Super. LEXIS 2742 (Pa.Super. September 9, 2002).

a few days later to follow up, Mr. Holler condemned the home, finding it uninhabitable. Mr. Holler testified that he based this decision on the residence's lack of a heating system, the poor structural condition of the home, and the unsanitary conditions.

Mr. Holler testified that the City of Allentown requires that the heating facility in a home "shall be capable of heating all habitable rooms and bathrooms to a temperature of 68 degrees." The furnace in the home was not working, and although the defendant had four or five portable heaters, the [C]ity of Allentown does not recognize space heaters as a means of heating a home. The defendant testified that the home was also equipped with electric baseboard heating, but Mr. Holler indicated that "because of the condition of the house, the way they had things stored in the house and boxes through the home . . . the baseboard heating would have been ineffectual in any case, most likely a fire hazard in my opinion." Mr. Holler also stated that the home did not have any smoke detectors, which the [C]ity of Allentown requires in the cellar and on each floor. There were also several plumbing fixtures in the home that did not work, including the kitchen faucet and a bathroom faucet.

Mr. Holler also testified that the [C]ity Code requires all walls to be in sound, smooth condition. He testified that the walls needed to be redone since they were cracked and covered with food. Pieces of the walls were also missing due to the water damage from the leaking roof. One quarter of the roof was missing "[a]nd everything had leaked down through the roof in the ceiling in the kitchen." There was also a water leak running into an electrical box in the basement, which Mr. Holler testified was a potential danger. The ceiling in the kitchen was almost totally gone, and there was also water damage in the living room and on the second floor in the children's bedroom. The floor was missing in the kitchen and "went down to the rafters of the ceiling in the basement." Mr. Holler testified that "[y]ou're essentially walking on [ ] the bottom half of a piece of plywood."

The unsanitary conditions of the home also led Mr. Holler to conclude that the home was unsafe and uninhabitable. He testified that there was food on the walls and ceilings, and tea bags were hanging from the ceilings. "[T]he home had an odor of stale and rotting food and a smell of being unclean. Bacteria in the air. That type of thing." Mr. Holler also indicated that there were flies, fleas and hundreds of mice in the home. The mice were "[a]ll through the house. Mainly in the living room and basement. There were nests all over the place."

Joshua Wallace, the defendant's fourteen year old son, testified that the residence at 1714 West Tremont Street was "Nasty. And really, really disgusting." Joshua said that not only were there flies, fleas and mice, but maggots were crawling on the ceiling. He also testified that there were mice in his bedroom, but they did not crawl on him since his bed was up high. Joshua's sister Faith slept in a "cubbyhole" under the stairs where she placed a board at the bottom of her door in an attempt to keep the mice out. Joshua testified that they set mice traps, but that his father said an exterminator would be too much money.

John Wallace, the defendant, took the stand and testified that the residence deteriorated because they had no money when their public assistance was denied on June 7, 2000. He indicated that there was a three-year waiting list for

public housing and that he could not get HUD housing because his family was too large. Mrs. Wallace worked outside the home eighty (80) to one hundred (100) hours a week, but the defendant had not been employed since August or September of 1998 because of his health problems. Specifically, the defendant stated that he had "lyphadenopathy," a chronic-fatigue type condition which he has self-diagnosed. The defendant also indicated that he was not being treated by a doctor and had not ever received disability because of the condition. The defendant claimed that because of his health problems he could not resume his work as an inventor of high technology products for companies. The defendant testified that because of his condition, he spends most of his time lying in bed trying to get his energy back. He also testified that he spends time working at his computer defending himself in cases brought by the Allentown School District. He testified that he has two (2) Hewlitt [sic] Packard computers, two (2) ink jet color printers, two (2) color scanners, a fax machine and a laser printer, which he uses for his work related activities. Joshua Wallace indicated that his father would stay on the computer from 5 p.m. to 4 or 5 a.m.

The defendant stated that most of the damage to the home occurred in the spring of 2000 because of the condition of the roof. The landlord came to look at the home three to four times a year, but refused to repair the roof and the defendant couldn't afford to fix it. The defendant claimed that the leaks caused the mold growths in the bathrooms, and that they just couldn't keep up with the cleaning. He also testified that the mice came in through the broken basement windows that they could not afford to replace.

The defendant indicated that there was food on the walls because his children were "experimenting." He said that the children started flipping tea bags on to the ceiling and "they had a contest to see whose wet tea bag would stay there the longest." They ate in the living room, and the tea bag contest developed into throwing spoonfuls of food onto the ceiling. The defendant testified that he could not clean the messes up and that it was the children's responsibility to clean up after themselves. He also stated that cleaning tasks were assigned to the children, and that it was their responsibility to clean.

The defendant also testified that Mrs. Wallace cleaned the home, but that she was also taking care of the kids, home schooling them, doing five (5) loads of laundry a day, and working outside the home. Mrs. Wallace testified that she worked three jobs and cleaned all the time. The defendant drove her to work in a 1989 van they bought for $2000 with their tax return money to replace their former vehicle that did not have headlights. The defendant's cellular phone rang in the middle of his testimony, which he claimed to have in order for Mrs. Wallace to receive work related calls from her temporary agency.

Trial Court Opinion (T.C.O.), 4/23/02, at 1–7 (footnotes omitted) [2].

¶ 3 Based upon the above recitation of the facts and the rejection of Appellant's testimony regarding his disability,[3] the tri-

---

**2.** The footnotes included in the trial court's opinion generally cite the portion of the transcript from which the court either quoted or paraphrased the testimony.

**3.** Specifically, the trial court informed Appellant just prior to finding him guilty that Appellant had not been "completely candid with this Court" and that in light of other testimony the court believed that Appellant was not

al court found Appellant guilty of eight counts of EWOC, and sentenced him to 36 months' probation.

¶ 4 On appeal to this Court, Appellant raises the following three issues for our review:

I. Was the evidence sufficient to sustain the guilty verdict to endangering the welfare of a child?

II. Did the Court err in entering inconsistent verdicts against two similarly situated defendants?

III. Did the Court err in allowing the opinion testimony of a trial witness without having first had the witness qualified as an expert in the field in which he testified?

Brief of Appellant at vi.

■ ¶ 5 Appellant first argues that the evidence was insufficient to sustain his conviction.

The test for determining the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner and drawing all proper inferences favorable to the Commonwealth, the fact-finder could reasonably have determined all elements of the crime to have been established beyond a reasonable doubt.

*Commonwealth v. Mackert*, 781 A.2d 178, 186 (Pa.Super.2001) (quoting *Commonwealth v. Miller*, 426 Pa.Super. 410, 627 A.2d 741, 744 (1992)). Any question of doubt is for the fact-finder, unless the evidence is so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circum-

stances. *Commonwealth v. Ketterer*, 725 A.2d 801, 804 (Pa.Super.1999).

¶ 6 The statutory provision for the offense of EWOC provides:

§ 4304 Endangering welfare of children

(a) Offense defined.–– A parent, guardian, or other person supervising the welfare of a child under 18 years of age commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support.

18 Pa.C.S. § 4304. Additionally, the term knowingly is defined as follows:

(2) A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

18 Pa.C.S. § 302(b)(2).

■ ¶ 7 Moreover, this Court has employed a three-prong standard to determine whether the Commonwealth has met its burden of establishing the intent element of the EWOC offense. *Mackert*. The *Mackert* opinion indicates that to support a conviction under the EWOC statute, the Commonwealth must establish each of the following elements: "(1) the accused is aware of his/her duty to protect the child; (2) the accused is aware that the child is in

---

"quite as disabled as you claim that you were." N.T., 5/23/01, at 269. The court further stated that "I think you were clearly capable of doing many of the things that would have kept this household together," *id.* at 270, and that "I find that you breached

your duty of care to them when under circumstances which are just fortuitous, really just fortuitous, that your children were not harmed by your neglect and your failure to take care of your children." *Id.* at 271.

circumstances that could threaten the child's physical or psychological welfare; and (3) the accused has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare." *Id.* at 187. *See also Commonwealth v. Pahel,* 456 Pa.Super. 159, 689 A.2d 963, 964 (1997); *Commonwealth v. Cardwell,* 357 Pa.Super. 38, 515 A.2d 311, 314 (1986).

■ ¶ 8 With regard to the EWOC statute, we further recognize the Pennsylvania Supreme Court's statement in *Commonwealth v. Mack,* 467 Pa. 613, 359 A.2d 770, 772 (1976), that:

[T]he purpose of juvenile statutes, as the one at issue here, is basically protective in nature. Consequently these statutes are designed to cover a broad range of conduct in order to safeguard the welfare and security of our children. Because of the diverse types of conduct that must be circumscribed, these statutes are necessarily drawn broadly. It clearly would be impossible to enumerate every particular type of adult conduct against which society wants its children protected. We have therefore sanctioned statutes pertaining to juveniles which proscribe conduct producing or tending to produce a certain defined result … rather than itemizing every undesirable type of conduct.

. . . .

"The common sense of the community, as well as the sense of decency, propriety and the morality which most people entertain is sufficient to apply the statute to each particular case, and to individuate what particular conduct is rendered criminal by it."

*Id.* (emphasis omitted) (quoting *Commonwealth v. Marlin,* 452 Pa. 380, 305 A.2d 14, 18 (1973)). Thus, according to the dictates of *Mack,* statutes such as this are to "be given meaning by reference to the 'common sense of the community' and the broad protective purposes for which they are enacted." *Id.* at 772.

¶ 9 Appellant does not dispute that, as a father, he had a duty to protect his children. Rather he argues that the evidence failed to establish: (1) that the circumstances in which the children were living could threaten the children's physical or psychological welfare; and (2) that his actions were either nonexistent or so lacking that they could not be reasonably expected to protect the welfare of his children.

¶ 10 The evidence adduced at trial overwhelmingly established that Appellant's house was dirty, cluttered, and emitted a foul odor. Dried food and food stains covered the walls. The house was teeming with flies, maggots and "hundreds of mice." The food in the refrigerator was spoiled. A hole in the roof had caused significant water damage to the interior of the house, specifically resulting in large holes in both the kitchen floor and ceiling. The hole in the roof also allowed water to flow into the electric box located in the basement. Appellant admitted that his house "was a dump." Despite these terrible living conditions, there was no evidence offered that the children were physically abused, or that any of the children suffered actual injury as a result of the condition of the house.

¶ 11 The language of the statute requires that the Commonwealth prove that the accused "endangers the welfare of the child." "Endanger" is defined as "put[ting] (someone or something) at risk or in danger." THE OXFORD AMERICAN DICTIONARY 561 (2001). "Risk" is defined as "a situation involving exposure to danger." *Id.* at 1470. But the statute does *not* require the actual infliction of physical injury. Nor does it state a requirement that the child or children be in imminent threat of physical harm. Rather

it is the awareness by the accused that his violation of his duty of care, protection and support is "practically certain" to result in the endangerment to his children's welfare, which is proscribed by the statute. *See* 18 Pa.C.S. § 302(b)(2).

¶ 12 Although no case law of which we are aware presents a factual scenario similar to what has occurred in the case presently before us, we believe that the endangerment or risk of harm to Appellant's children in this case was sufficient to support Appellant's conviction. We are cognizant that in the published cases where an appellant has challenged the sufficiency of the evidence to support an EWOC conviction, the factual circumstances have included either physical abuse or sexual abuse by the defendant or a failure to intervene in circumstances that resulted in physical or sexual abuse or death. In cases that did not raise a sufficiency claim or where the evidence was held to be insufficient to sustain a conviction, the facts again included physical or sexual abuse or a failure to intervene in such circumstances.

¶ 13 We are also aware that the trial court understood that the facts here departed from fact patterns found in case law. Therefore, prior to announcing the verdict, the trial court stated:

> So based upon everything that I have heard today, while it is a difficult bridge to ... cross, because of the fact that we are dealing with generally cases in which actual harm was caused, I don't believe the fortuitous circumstance that no harm was caused here should result in a difference as to whether this statute applies. So again, the fortuitous circumstance that no injury occurred, which isn't required by the statue, should not make a difference in the outcome of this particular case.

N.T., 5/23/01, at 271.

¶ 14 We agree with the trial court's reasoning that although the children suffered no physical harm, that fact does not alter the fact that Appellant endangered their welfare. Here, Appellant, as the children's father, was aware of his duty to protect the children; he was aware that the squalid living conditions threatened his children's welfare; and yet he failed to act. Rather, he hid behind his alleged disability to excuse his failure to even attempt to ameliorate the deplorable conditions in his household. "The person charged with the duty of care is required to take steps that are reasonably calculated to achieve success. Otherwise, the meaning of 'duty of care' is eviscerated." *Commonwealth v. Cardwell*, 357 Pa.Super. 38, 515 A.2d 311, 315 (1986).

¶ 15 Without a crystal ball no one can determine how, when and in what manner the conditions in Appellant's house would cause harm to the children. Nonetheless, the issue is whether the children's welfare was endangered, i.e., whether the children were exposed to the risk of danger. Moreover, we believe that the *Mack* court's reference to the "common sense of the community" should guide this Court in its decision here. Allowing children to live with such filth and vermin, with no working furnace for heat, and with water running into the electrical box creating a fire hazard, cannot be condoned. Appellant's inaction clearly endangered his children's welfare. Obviously, the trial court likewise determined that the risk of physical and/or psychological harm was present, using its common sense to "individuate what particular conduct is rendered criminal...." *Mack*, 359 A.2d at 772.

¶ 16 Even with the children's removal by CYS pursuant to the Juvenile Act, 42 Pa. C.S. §§ 6301–6365, thus, ensuring no further risk of harm, the fact remains that Appellant was at fault for allowing condi-

tions in the home to reach such deplorable proportions. Although CYS and other civil authorities are charged with the duty to "provide for the care, protection, safety and wholesome mental and physical development of children, 42 Pa.C.S. § 6301(b)(1.1), their performance of their duty does not absolve Appellant of the necessity to perform his "duty of care, protection and support." 18 Pa.C.S. § 4304. The criminal sanction imposed here by the trial court may not resolve any underlying problem, but the sanction of probation may reinforce the seriousness of his inaction to Appellant. Appellant cannot rely on luck or fortuitous circumstances to protect his children; it was his duty to do so and he failed.[4] Accordingly, we conclude that there was sufficient evidence to support the guilty verdict.

■ ¶ 17 Appellant next claims that the trial court erred by entering inconsistent verdicts. He asserts that because he and his wife, co-defendants below, were similarly situated, the court could not find him guilty and acquit her. Appellant cites no case law that supports this argument. Moreover, we find support for the converse. *See Commonwealth v. Campbell,* 539 Pa. 212, 651 A.2d 1096, 1099 (1994) (stating "consistency in verdicts in a joint trial for conspiracy is not necessarily required" and "the acquittal of the sole alleged co-conspirator does not per se preclude the conviction of the remaining defendant, even if the defendants are jointly tried"); *Commonwealth v. Merbah,* 270 Pa.Super. 190, 411 A.2d 244, 247 (1979) (stating that "[c]onsistent verdicts [of co-defendants] are not required provided that there is sufficient evidence to support the verdict reached").

¶ 18 The trial court found that Appellant and his wife were not similarly situated and that her actions were not " 'so lame and meager that such actions cannot reasonably be expected to protect the child's welfare.' *Mackert, supra* at 187." T.C.O., 4/23/02, at 10. The court based this conclusion on the following facts:

> The testimony at trial revealed that the actions Mrs. Wallace took in trying to care for her eight (8) children placed her in a different situation than that of the [Appellant], who made no effort at all. At the trial, Mrs. Wallace testified that she did five loads of laundry a day, home schooled the children, cooked, and cleaned all the time while she worked seven (7) days a week. She also testified that she often would only sleep four (4) hours a night while attempting to get everything done, while her husband remained unemployed and made no efforts to help because of his self-diagnosed chronic fatigue syndrome.

T.C.O., 4/23/02, at 9–10 (footnotes omitted).[5] Thus, having found that sufficient evidence supported Appellant's guilty verdict and recognizing, as did the trial court,

---

4. This Court is eminently aware that Appellant's defense rests in major part on his lack of funds and his ill health. As noted above, the trial court did not believe Appellant's claims as to the extent of his disability. Furthermore, Appellant's time spent at his computers each night strongly suggests that he could have sought employment and alleviated some of the living conditions he claims he could not rectify due to a lack of funds. In this case, claiming a lack of funds cannot excuse the deplorable conditions that existed here as a result of Appellant's sustained dereliction of his most basic parenting duties.

5. In discussing its decision to find Appellant's wife not guilty, the trial court stated that "the question becomes with respect to Mrs. Wallace whether or not she violated the duty of care to her children when she did ... as much as she could to keep the home together. And from her testimony it seems that much of this deterioration started to occur after she started working the 80 to a hundred hours a week." N.T., 4/23/02, 268–69.

that Appellant's wife was not "similarly situated," we conclude that the trial court did not err in finding Appellant guilty and his wife not guilty.

■ ¶ 19 Turning to Appellant's final issue concerning whether Mr. Holler, the Code Enforcement Officer, was properly qualified as an expert, we rely on the trial court's recitation of the law and the facts:

> The qualification of an expert witness rests within the sound discretion of the trial judge, and absent an abuse of discretion, the decision of the trial judge should be upheld. *Commonwealth v. Stallworth*, 566 Pa. 349, 781 A.2d 110 (2001). "It is well established in this Commonwealth that the standard for qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine." *Miller v. Brass Rail Tavern*, 541 Pa. 474, 480–81, 664 A.2d 525, 528 (Pa.1995). *See also Stallworth, supra*, 781 A.2d at 121. It is also well-established that a witness does not need formal education on the subject matter of the testimony, and may be qualified to render an expert opinion based on training and experience. *Miller, supra* at 481, 664 A.2d at 528. "It is not a necessary prerequisite that the expert be possessed of all of the knowledge in a given field, only that he possess more knowledge than is otherwise within the ordinary range of training, knowledge, intelligence or experience." *Id.*
>
> Mr. Holler testified that he had inspected several hundred houses during the two (2) years he worked as an Allentown Code Inspector. He received on-the-job training with another inspector and was shown how to look for violations of the [C]ity Code. For example, Mr. Holler testified that when inspecting a home he would look for electrical problems, such as wiring or burned outlets and then would require the homeowner to call an electrician to check it. This Court found that this experience allowed Mr. Holler to testify as to the Code violations he observed in the Wallace house. We also note that Mr. Holler, as a lay person, would have been able to testify as to what he observed in the Wallace house. *See* Pa.R.E. 701.

T.C.O., 4/23/02, at 10–11 (footnotes omitted). Accordingly, we conclude that this claim is also without merit.

¶ 20 Judgment of sentence AFFIRMED.

¶ 21 CAVANAUGH, J. files a Dissenting Opinion.

CAVANAUGH, J., Dissenting:

¶ 1 I respectfully, but vigorously, dissent.

¶ 2 I agree with the majority that the verdicts, as to John and Margaret Wallace, were not inconsistent. If anything, Margaret's efforts on behalf of her children were heroic. They were assuredly not criminal and indeed not culpable in the civil sense. I also agree that the court did not err in permitting the evidence, without expert qualification, of Mr. Holler. The witness testified as to matters within the knowledge of an adult layperson.

¶ 3 However, I believe the conviction of John Wallace is the result of an abuse of prosecutorial discretion by the district attorney in seeking a criminal solution for circumstances which are properly the subject of civil court remedies. This ill-considered prosecution has led to a conviction where the evidence is insufficient.

¶ 4 I certainly agree that when Officer Rivera entered the Wallace rental home, he found conditions which were unspeakably squalid. As described, the state of the household would be revolting to even one with the most hardened sensibilities. As the apparently physically-capable parent of the eight children and the responsible adult on the premises, it is appropriate that John Wallace be called to task for his dereliction. However, the horrific state of the Wallace household was such that any attempt at explanation in the criminal forum by Wallace, or on his behalf, is to invite responsive ridicule and all but certain rejection.

¶ 5 The majority would fix criminal responsibility on Wallace since, it concludes, that his failures make it "practically certain to result in the endangerment of his children's welfare."

¶ 6 The majority today renders criminal the failure of a parent to provide a suitable household free from perceived safety hazards to children. The court disregards the underlying rationale for the imposition of criminal sanctions, undermines the proper role for civil authorities in our communities, and ignores substantial precedent of the courts of this Commonwealth.

¶ 7 The majority recognizes that "no case law of which we are aware presents a factual scenario similar to what has occurred in the case presently before us." The majority further acknowledges that the factual circumstances on which the courts have held evidence sufficient to support a conviction under § 4304 have *always* included either physical abuse or sexual abuse committed by the defendant or a defendant's failure to intervene in circumstances that resulted in physical or sexual abuse, death, or a reasonably imminent threat of death.

¶ 8 We review the precedents comprehensively. *See Commonwealth v. Mac-*

*kert,* 781 A.2d 178, 187 (Pa.Super.2001) (finding evidence sufficient where children were physically abused and one child had lost twenty percent of her body weight in two weeks although vacating judgment of sentence on other grounds), *appeal denied,* 568 Pa. 696, 796 A.2d 980 (2002); *Commonwealth v. Passarelli,* 789 A.2d 708 (Pa.Super.2001) (finding evidence sufficient where child had a bump on the head, a skull fracture, brain swelling and hemorrhaging and bruises consistent with "shaken-impact syndrome"); *Commonwealth v. Foster,* 764 A.2d 1076 (Pa.Super.2000) (finding evidence sufficient where parents refused to take their child for treatment of his cancer and he was within twenty-four hours of death by the time treatment was received), *appeal denied,* 566 Pa. 658, 782 A.2d 542 (2001); *Commonwealth v. Vining,* 744 A.2d 310 (Pa.Super.1999) (*en banc*) (finding evidence sufficient where child was under care of babysitter and suffered severe burns and internal injuries consistent with abuse); *Commonwealth v. Bishop,* 742 A.2d 178 (Pa.Super.1999) (finding evidence sufficient where five year old victim's stepgrandfather sexually abused her while she was in his care); *Commonwealth v. Kellam,* 719 A.2d 792 (Pa.Super.1998) (finding evidence sufficient where appellant boyfriend assumed care of girlfriend's child and failed to feed it which resulted in the child's death), *appeal denied,* 559 Pa. 714, 740 A.2d 1145 (1999); *Commonwealth v. Fewell,* 439 Pa.Super. 541, 654 A.2d 1109 (1995) (finding evidence sufficient where appellant mother placed plastic bag over her son's head to stop him from crying which resulted in his death by asphyxiation); *Commonwealth v. Davis,* 437 Pa.Super. 471, 650 A.2d 452 (1994) (finding evidence sufficient where victim testified that stepfather forced him to have oral and anal sex beginning at the age of 6 although vacating and remanding on other

grounds), *aff'd*, 543 Pa. 628, 674 A.2d 214 (1996); *Commonwealth v. Cottam*, 420 Pa.Super. 311, 616 A.2d 988 (1992) (finding evidence sufficient where parents starved one child to death and caused another to suffer severe malnutrition because of their religious beliefs), *appeal denied*, 535 Pa. 673, 636 A.2d 632 (1993); *Commonwealth v. Pankraz*, 382 Pa.Super. 116, 554 A.2d 974 (1989) (finding evidence sufficient where defendant inserted knife and screwdriver into the vagina of his 4 year old daughter), *appeal denied*, 522 Pa. 618, 563 A.2d 887 (1989); *Commonwealth v. Ogin*, 373 Pa.Super. 116, 540 A.2d 549 (1988) (*en banc*) (finding evidence sufficient where parents threw their child against the wall, violently struck her in the face and forced hot food into her face that caused burns); *Commonwealth v. Cardwell*, 357 Pa.Super. 38, 515 A.2d 311 (1986) (finding evidence sufficient where mother did not act to remove her 11 year old daughter from their house when she knew stepfather was having sexual intercourse with her that resulted in two pregnancies); *Commonwealth v. Taylor*, 324 Pa.Super. 420, 471 A.2d 1228 (1984) (finding sufficient evidence where father took teenage daughter and friend to hotel, exposed himself, forced girls onto bed, grabbed their genitalia and made sexually explicit remarks although vacating and remanding on other grounds).

¶ 9 Indeed, as the majority also recognizes, even in those cases where the sufficiency of the evidence was not raised on appeal or the court found the evidence insufficient to sustain the conviction, the underlying facts included physical or sexual abuse by the defendant or the defendant's failure to intervene in circumstances that resulted in actual physical or sexual abuse, death or a reasonably imminent threat thereof. *See Commonwealth v. Chapman*, 763 A.2d 895 (Pa.Super.2000) (reversing in part and affirming in part trial court's exclusion of Commonwealth's

evidence where mother of child and acquaintance who was babysitting were charged after eight-month old child drowned in bathtub), *appeal denied*, 565 Pa. 636, 771 A.2d 1278 (2001); *Commonwealth v. Brown*, 721 A.2d 1105 (Pa.Super.1998) (holding that live-in boyfriend could be convicted as a person supervising the welfare of a child for not reporting girlfriend's ongoing abuse of her own child that led to the child's death); *Commonwealth v. Martir*, 712 A.2d 327 (Pa.Super.1998) (holding that offense did not merge with reckless endangerment where defendant convicted for scalding child with hot water); *Commonwealth v. Halye*, 719 A.2d 763 (Pa.Super.1998) (finding insufficient evidence where appellant engaged in sexual abuse of child while visiting home but was not in role of caretaker and had no duty to protect child), *appeal denied*, 560 Pa. 699, 743 A.2d 916 (1999), *cert. denied*, 529 U.S. 1012, 120 S.Ct. 1287, 146 L.Ed.2d 233 (2000); *Commonwealth v. Pahel*, 456 Pa.Super. 159, 689 A.2d 963 (1997) (finding evidence insufficient to prove that mother knew that her failure to take child to doctor for two days after noticing injury caused by boyfriend's abuse created a risk to her child's welfare); *Commonwealth v. Miller*, 411 Pa.Super. 33, 600 A.2d 988 (1992) (finding evidence insufficient to prove that mother "knowingly" left her child at home alone where father promised that someone would look after child and building fire caused child's death); *Commonwealth v. Campbell*, 398 Pa.Super. 116, 580 A.2d 868 (1990) (affirming grant of motion in arrest of judgment where parents were convicted for not intervening in sexual activity where 13 year old daughter became pregnant by 18 year old boyfriend); *Commonwealth v. Barnhart*, 345 Pa.Super. 10, 497 A.2d 616 (1985) (affirming conviction where parents did not seek medical treatment for their son because of

religious beliefs and he died of treatable cancer but vacating sentence on double jeopardy grounds), *appeal denied*, 517 Pa. 620, 538 A.2d 874 (1988), *cert. denied* 488 U.S. 817, 109 S.Ct. 55, 102 L.Ed.2d 34 (1988); *Commonwealth v. Moore*, 261 Pa.Super. 92, 395 A.2d 1328 (1978) (affirming conviction where father physically abused his seven year old stepson by beating him with a stick although sufficiency of evidence not raised on appeal).

¶ 10 Notwithstanding its acknowledged inability to reference even one case imposing criminal liability on facts similar to those presently before us, the majority does not address its departure from precedent other than to state that the "common sense of the community" should guide the decision. I agree that the "common sense of the community, as well as the sense of decency, propriety and the morality which most people entertain is sufficient to apply the statute to each particular case, and to individuate what particular conduct is rendered criminal by it." *Commonwealth v. Mack*, 467 Pa. 613, 359 A.2d 770, 772 (1976) (internal citation omitted) (quoting *Commonwealth v. Marlin*, 452 Pa. 380, 305 A.2d 14, 18 (1973)). The "common sense of the community," however, must be exercised in light of past precedent and the purposes of the criminal law. The majority observes, "Allowing children to live with such filth and vermin, with no working furnace for heat, and with water running into the electrical box creating a fire hazard, cannot be condoned." While I unequivocally agree with this conclusion, it ignores the question of whether such conditions warrant subjection of a parent to criminal liability.

¶ 11 The plain facts instantly are that the Wallaces lived in a rental premises. The record suggests that the owner lives in Florida and is, thus, an absentee owner. The County of Lehigh has a children and youth agency and the City of Allentown has a housing authority. Since we have only a criminal court record, we do not know why either agency did not earlier intervene. The record manifests that they have now done so. The house has been condemned and the children are in custodial control of the county. The criminal conviction of John Wallace almost certainly will act as a preemptive termination of his parental rights to eight of his eleven children. When the county moves to terminate his parental rights, one cannot suppose any effective defense by a parent who has been convicted of endangering the welfare of the subject children. I submit that it is patent that the children and youth and housing authorities should have been more vigilant and sooner acted to: A) have the children declared dependent and, B) condemn the structure where they lived.

¶ 12 Since, at the time of this criminal trial, the eight children were within the control of the Commonwealth, we may be assured that the children have suffered no physical harm or mental illness because of their father's neglect, or, most certainly, the evidence would have been produced at trial. They are no longer ill-housed and their future care, custody and control are subject to judicial order. As to John Wallace, since this is a criminal proceeding, we receive only glimpses as to what ails him. We do not have the benefit of juvenile custody proceedings where his mental and physical status would be investigated and, if necessary, remedial and counseling services provided. As it is, we are left with a picture of either a parent who is overborne by grandiose ideas incapable of practical fruition or one who is simply slothful. In either case, the situation will not be ameliorated by a devastating criminal conviction and the one-year services of a probation officer.

**498** ■ 

¶ 13 I would reverse and vacate the conviction and leave this tragic matter to civil authorities.