J. S10027/17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA     :     IN THE SUPERIOR COURT OF
                                 :          PENNSYLVANIA
                                 :
        v.                       :
                                 :
                                 :
                                 :
DWAYNE GOODEN,                   :
                                 :
        Appellant                :     No. 435 EDA 2016

Appeal from the Judgment of Sentence January 7, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0005197-2014

BEFORE: BENDER, P.J.E., DUBOW, J., and SOLANO, J.

MEMORANDUM BY DUBOW, J.:                    **FILED FEBRUARY 17, 2017**

Appellant, Dwayne Gooden, appeals from the January 7, 2016 Judgment of Sentence entered in the Philadelphia County Court of Common Pleas. After careful review, we affirm on the basis of the trial court's Opinion, which found that there was sufficient evidence to support the jury's convictions for Endangering the Welfare of a Child and Unlawful Restraint.

The trial court's Pa.R.A.P. 1925(a) Opinion includes a thorough and complete narrative of the facts and procedural history of this case, which we adopt for purposes of this appeal. *See* Trial Court Opinion, filed 7/20/16, at 2-7. While we will not go into exhaustive detail here, some of the relevant facts are as follows.

In 2013 and 2014, Appellant lived with his then girlfriend Zoraya Velez ("Victim Mother") and her three young sons ("Victim Children"). Appellant

drove the Victim Children to school, cooked meals for the Victim Children, helped them with schoolwork, and generally contributed to the care of the three Victim Children.

From the evening of March 29, 2014 to the early morning hours of March 30, 2014, Appellant subjected his victims to a campaign of escalating threats and physical abuse. Appellant demanded money from Victim Mother, spat in her face, smacked her, and threatened to kill her. He told Victim Mother that she could not leave the apartment or phone for help, and he took her phone and keys from her. Around 5:00 am, after Appellant fell asleep, Victim Mother retrieved her phone, called the front desk of her building, and asked for help.

At approximately 5:30 am, police responded to the apartment and knocked on the door. The knocking woke Appellant, who began barricading the door with a bedframe and other large objects. Appellant then went after Victim Mother, holding a pillow over her face. He pinned her to the bed, cutting off her ability to breathe. Although she briefly wrestled free, Appellant tackled her to the floor, covering her mouth with his hands and later forcing a dirty washcloth into her mouth to prevent her from calling out for help.

Victim Mother tried to scream, and called for her sons to open the front door to get help. Appellant called the Victim Children "motherfuckers," told them he would kill them if they went near the front door, and then

continued assaulting their mother, dragging her across the apartment floor in view of the boys.

The oldest of the Victim Children, Z.Z., who was 11 or 12 years old on the night of the attack, testified at trial that he felt traumatized by the incident.

It took the collective efforts of seven or eight officers, kicking the door and utilizing a crowbar, to finally gain entry into the apartment. On the other side of Appellant's makeshift barricade, Victim Mother lay bleeding in the corner of the apartment, suffering injuries to her chest, hands, neck, knee, head and face. A laceration in her bottom lip required stitches.

Appellant, who was fugitive on unrelated charges, refused to comply with the officers who entered the apartment. He was taken into custody at gunpoint, and charged with Attempted Murder, Aggravated Assault, Unlawful Restrain, Endangering the Welfare of a Child, and related charges.

Appellant proceeded to a jury trial. On October 23, 2015, the jury found Appellant guilty of Unlawful Restraint, Simple Assault, and Endangering the Welfare of a Child.[1] On January 7, 2016, the trial court sentenced Appellant to five to ten years of incarceration.

On February 1, 2016, Appellant timely-filed the instant appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

On appeal, Appellant raises two issues:

_____

[1] 18 Pa.C.S. §§ 2902(a)(1), 2701(a), and 4304(a)(1), respectively.

1. Was not the evidence insufficient to establish endangering the welfare of children [] where Appellant did not meet the definition of a "person supervising the welfare of a child," and there was insufficient evidence that the welfare of a child was, in any event, endangered?

2. Was not [A]ppellant erroneously convicted of unlawful restraint [] as there was insufficient evidence either that he exposed the complainant, Zoraya Velez, to actual risk of serious bodily injury or that she was deprived of her freedom to leave her apartment.

Appellant's Brief at 3.

In reviewing the sufficiency of the evidence, our standard of review is as follows:

> The standard of review for a challenge to the sufficiency of the evidence is to determine whether, when viewed in a light most favorable to the verdict winner, the evidence at trial and all reasonable inferences therefrom is sufficient for the trier of fact to find that each element of the crimes charged is established beyond a reasonable doubt. The Commonwealth may sustain its burden of proving every element beyond a reasonable doubt by means of wholly circumstantial evidence.
>
> The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubt raised as to the accused's guilt is to be resolved by the fact-finder. As an appellate court, we do not assess credibility nor do we assign weight to any of the testimony of record. Therefore, we will not disturb the verdict unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.

***Commonwealth v. Vogelsong***, 90 A.3d 717, 719 (Pa. Super. 2014)

(citations and quotations omitted).

In his first issue, challenging his conviction for Endangering the Welfare of a Child, Appellant presents two distinct arguments. First, Appellant avers that he did not meet the required definition of a "person supervising the welfare of a child" because the evidence at trial showed Appellant "was merely present in [the children's] apartment in the role as the mother's boyfriend" and that Appellant and the Victim Children had "virtually no relationship at all." Appellant's Brief at 15.

The Honorable Diana L. Anhalt has authored a comprehensive, thorough, and well-reasoned Opinion, citing to the record and relevant case law in addressing Appellant's claims. After a careful review of the parties' arguments, and the record, we affirm on the basis of that Opinion, which held that Appellant met the definition of a "person supervising the welfare of a child" because he voluntarily resided with the Victim Children for nearly a year and took on an active role helping with the Victim Children including driving them to school, preparing meals for them, and assisting with schoolwork. Trial Court Opinion, filed 6/2/16, at 7-9.

Second, Appellant avers that, because the Victim Children were "merely bystanders" to his assault on their mother, his actions did not endanger their welfare. Appellant's Brief at 16. Judge Anhalt's Opinion includes a comprehensive, thorough, and well-reasoned discussion of this claim, with citations to the record and relevant case law. After a careful review of the parties' arguments, and the record, we affirm on the basis of

that Opinion, which found that Appellant placed the Victim Children "in a situation that threatened their physical or psychological welfare" and ultimately traumatized the Victim Children when he barricaded them in the apartment, assaulted their mother in their presence, and referred to the children as "motherfuckers" and threatened to kill them when they attempted to help their mother. Trial Court Opinion, filed 6/2/16, at 9-11.

In his second issue, Appellant challenges his conviction for Unlawful Restraint on the grounds that "the Commonwealth failed to prove that [A]ppellant exposed [Victim Mother] to a risk of serious bodily injury or that [Victim Mother] was deprived of her freedom to leave her apartment[.]" Appellant's Brief at 17.

Judge Anhalt's Opinion includes a comprehensive, thorough, and well-reasoned discussion of this claim, with citations to the record and relevant case law. After a careful review of the parties' arguments, and the record, we affirm on the basis of that Opinion, which found that Appellant (i) detained Victim Mother against her will by physically restraining her, threatening her and her children, and barricading the door; and (ii) exposed Victim Mother to the risk of serious bodily injury when he "spat in her face, smacked her, and tried to silence her screams by holding a pillow over her face, holding his hands over her mouth and nose, shoving a washcloth in her mouth, and choking her." Trial Court Opinion, filed 7/20/16, at 11-12.

J. S10027/17

The parties are directed to attach a copy of the trial court's June 2, 2016 Opinion to all future filings.

Judgment of Sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/17/2017

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION – CRIMINAL SECTION

**FILED**

JUL 2 0 2016

Appeals/Post Trial
Office of Judicial Records

COMMONWEALTH OF PENNSYLVANIA     :
                                     :
         v.                       :       CP-51-CR-0005197-2014
                                       :
DWAYNE GOODEN                    :

## OPINION

**ANHALT, J.**                                                 **July 20, 2016**

### OVERVIEW AND PROCEDURAL HISTORY

On October 23, 2015, a jury found Dwayne Gooden (hereinafter "Appellant") guilty of Unlawful Restraint under 18 Pa.C.S.A. § 2902(a)(1), Simple Assault under 18 Pa.C.S.A. § 2701(a), and Endangering the Welfare of a Child under 18 Pa.C.S.A. § 4304(a)(1). On January 7, 2016, this Court sentenced Appellant to five to ten years of incarceration to run consecutively to any sentence currently being served.

Appellant filed a timely notice of appeal on February 1, 2016. On March 15, 2016, Appellant filed both a Statement of Errors Complained of on Appeal and a Petition for Extension of Time to File a Supplemental Statement of Errors Complained of on Appeal upon Receipt of the Notes of Testimony. On June 2, 2016, Appellant filed a Supplemental Statement of Errors Complained of on Appeal. Appellant raises the following arguments on appeal:

a. The evidence was insufficient to support a conviction for endangering the welfare of a child where the Commonwealth failed to present evidence that Appellant was a parent, guardian, or person supervising the welfare of any of the complainant's children, and therefore he did not violate any duty of care, protection, or support.

b. The evidence was insufficient to support a conviction for endangering the welfare of a child where the evidence failed to establish that the welfare of any child was endangered during the alleged incident between Appellant and the complainant, Zoraya Velez. CP-51-CR-0005197-2014 Comm. v. Gooden, Dwayne
Opinion



7476302241

c. The evidence was insufficient to support a conviction for unlawful restraint of Zoraya Velez where the Commonwealth failed to establish that she was deprived of her freedom to leave the apartment or that she was placed in danger of suffering serious bodily injury.

## FACTS

On March 30, 2014, around 5:30 a.m., Philadelphia Housing Authority Police Officer Matthew Farnan received a radio call to respond to a domestic incident at 2411 North 11th Street, Apartment 703. Notes of Testimony (N.T.) 10/22/15 at 48-49. When Officer Farnan and his partner arrived at the residence, they knocked and received no response. *Id.* at 50. After knocking harder, Officer Farnan heard a "rumbling" inside the apartment and could hear that someone was awake and moving around inside. *Id.* at 50-51. The officers knocked harder, hearing more movement and "what sounded like a yelp, like a scream . . ." *Id.* at 51. After hearing more yelps and movement inside, the officers decided to forcibly open the locked door and called for backup. *Id.* at 51-52.

Several additional officers responded, including Officer Vondell Cook, who heard "gut screams to the point where [she was] scared of what was going on on the other side of that door." *Id.* at 205. While trying to open the door, multiple officers testified to hearing a feminine-sounding voice say something through the door along the lines of, "[i]t's fine, he's gone." *Id.* at 51, 209; N.T. 10/23/15 at 14. In order to gain entry, it took the efforts of seven or eight officers kicking the door while one officer used a crowbar to pry the door open. N.T. 10/22/15 at 54, 55, 67-68; N.T. 10/23/15 at 25-26. When the officers entered the apartment, they observed that multiple bins, boxes, and a metal bedframe had been placed in front of the entry door. N.T. 10/22/15 at 55. They saw a woman laying on the floor in a corner of the apartment, a man standing in the center of the apartment, and three children in a bedroom. *Id.* at 56, 70, 71, 208; N.T. 10/23/15 at 16, 27.

2

Officer Farnan testified that the woman, complainant Zoraya Velez, was hysterically crying and had ripped clothing, a bloody lip, lacerations on her face and hands, and bruises on her arms and neck. N.T. 10/22/15 at 56, 57, 72. Officer Cook similarly testified that she was "cowering and balled up in the corner," bloody and shaking uncontrollably, and seemingly in shock. *Id.* at 208-09. Officer Cook also testified that the complainant's bra and breast were exposed as a result of her ripped tank-top, so the officer covered her with a towel or sheet. *Id.* at 222. Officer Cook then held the complainant in her lap while she cried and told the officer that she thought she was going to die. *Id.* at 208-09.

Meanwhile, officers ordered Appellant to get on the ground, but he refused. N.T. 10/23/15 at 27. So, Officer Dennis Stevens held Appellant at gunpoint in order to restrain him, at which point the officers took him into custody. *Id.* They brought Appellant in for booking, while Officers Cook and Lankford took the complainant to Temple University Hospital. N.T. 10/22/15 at 58, 223; N.T. 10/23/15 at 65-66.

The complainant and her son, Zackarie, each testified as to what they witnessed inside the apartment while the police were trying to gain entry. N.T. 10/22/15 at 73, 109. At the time of this incident, Zackarie was 11 or 12 years old and had been living at his mother's apartment with his mother, his two younger brothers, and his mother's ex-boyfriend, Appellant. *Id.* at 75, 77. Zackarie testified that Appellant had been living with them for anywhere between six and nine months prior to March 30, 2014. *Id.* at 88. Zackarie also testified that he liked Appellant and considered him a friend, and that Appellant sometimes drove Zackarie to school, cooked Zackarie dinner, and generally helped the complainant and the children around the house. *Id.* at 89-90.

3

Zackarie testified that on the morning of March 30, 2014, he was awoken by the police knocking on the door. *Id.* at 77-78. At that point, he witnessed Appellant run out of the master bedroom and yell to the police in a high-pitched voice, "[h]e's running down the steps." *Id.* Zackarie explained that, although placing bins in front of the door was something the family did every night, Appellant added additional objects that morning, including a metal bar from the door and a box spring, so that the police could not open the door. *Id.* at 82-83. While the officers were banging on the door, Zackarie's younger brother tried to remove the objects blocking the door, but Appellant said, "[g]et back in your room." *Id.* at 83. Afterward, Zackarie recalled Appellant telling the complainant to "shut up" before dragging her across the apartment. *Id.* at 80-81. Then, Appellant said he was going to try to jump out of the window, even though the apartment's windows were barred, and told the children to return to their rooms and not to open the front door. *Id.* at 81. When the police entered the apartment, Zackarie recalled seeing his mother bloody and in a "hysterical" condition, screaming that Appellant had held her hostage and had not let her leave the apartment. *Id.* at 79, 104. Zackarie testified to feeling "traumatized" by the incident and "confused" by his mother's bloody lip. *Id.* at 85.

The complainant testified that Appellant was her boyfriend at the time of the incident, and that he stayed with her and her sons on and off between April 2013 and March 30, 2014. *Id.* at 110-11, 140. She explained that they were supportive of each other and that Appellant helped care for her children, including cooking for them and helping them with their schoolwork. *Id.* at 139-40. She testified that she became afraid of Appellant after learning that he was in fugitive status. N.T. 10/22/15 at 141. Indeed, in January 2014, Appellant was convicted of possessing a firearm in violation of 18 Pa.C.S.A. § 6105(a), Docket Number CP-51-CR-0000648-2012, but had failed to appear for sentencing in February 2014.

4

The complainant stated that on the afternoon of March 29, 2014, her three sons left the apartment to stay overnight with their father. *Id.* at 114. Later that day, Appellant questioned the complainant about her finances and expressed a need for money. *Id.* at 115. He spat in her face, smacked her, and told her he was going to kill her. *Id.* at 116-17. Fearing for her safety, she called her children's father and asked him to bring the children back that evening. *Id.* at 115. She explained that she could not ask her ex-husband for help or tell him to call the police because Appellant was holding the phone while she spoke. *Id.* at 146. After the children arrived home, Appellant demanded child support money that the complainant had received from her ex-husband and had left at a neighbor's house. *Id.* at 147, 118. They left the apartment to get the money, and, when they arrived home, Appellant kept the complainant's keys and cell phone. *Id.* at 118. When they went to bed, Appellant watched the complainant the entire night and told her that she was not going to go anywhere or call anyone, and that he was going to hold on to her phone and keys. *Id.* at 118, 120.

She lay awake the entire night as Appellant watched her, and he did not fall asleep until about 5:00 a.m. *Id.* at 120-21. At that point, she grabbed her phone from Appellant and called the front desk of her building because she wanted Appellant escorted out of her apartment. *Id.* at 121. When police knocked on the door, Appellant awoke and said angrily, "[y]ou called the cops?" *Id.* at 122. He then went to the door and placed a bedframe where the bins were already positioned. *Id.* at 125. Appellant then returned to the bedroom and grabbed the complainant, telling her to be quiet so that the police would leave. *Id.* at 122. She yelled for help, prompting Appellant to push her down on the bed and hold a pillow over her face. *Id.* She tried to fight back and scream for help, but began to lose air. *Id.* Eventually, she was able to break free and tried to run, but Appellant grabbed her and got on top of her, shoving his hand on her mouth and nose in

5

order to silence her. *Id.* at 122-23. Then, the complainant bit Appellant and he bit her back. *Id.* at 123. Next, he shoved a dirty, wet washcloth into her mouth and put his other hand on her nose while holding her down on the floor with his body and elbows. *Id.*

She kept trying to scream, and called for her sons to open the front door, but Appellant told them something along the lines of, "[g]et out of here, you motherfuckers. Don't open the door. Go back to your bedroom or I'll kill all of you." *Id.* at 124-25, 190-91. The children ran to their rooms and Appellant took the complainant by the throat with both hands, lifted her up in the air, and threw her down on the bed, continuing to choke her with both hands. *Id.* at 126. She became unable to breathe and, believing she was going to die, began to pray to God. *Id.* at 127. Appellant then told her he was going to kill her "because if he was going back to jail, it was going to be for something worth it." *Id.* When the police finally broke through the door, Appellant released the complainant and said, "[m]y mom will bail me out, you bitch. And I will come back and kill you." *Id.* She recalled being in pain and feeling blood gushing from somewhere on her face. *Id.* at 129. After police officers took Appellant into custody, the complainant was escorted by police to Temple University Hospital where she received three stitches in her bottom lip. *Id.* at 129-30; N.T. 10/23/15 at 65-66. She also had abrasions on her chest, right hand, left hand, and neck, along with bruising and pain to her right knee and neck. N.T. 10/23/15 at 66.

The complainant testified that she then went to the Central Detective Division to give a statement and be photographed. N.T. 10/22/15 at 132-33. She had other injuries that were not visible in the pictures taken by detectives, including bruising that began the next day and bumps on her head that were concealed by her hair. *Id.* at 136. In spite of this, she was unsure whether to press charges against Appellant because of their relationship, even though this was not the first

6

time he had been violent towards her. *Id.* at 138, 199. She ultimately decided that she was "sick of going through this" and was no longer afraid to pursue the case because she felt that she would be properly defended. *Id.* at 199.

## DISCUSSION

Each issue raised on appeal concerns the sufficiency of the evidence supporting Appellant's convictions. A challenge to the sufficiency of the evidence presents a question of law and is subject to plenary review. *Commonwealth v. Hitcho*, 123 A.3d 731, 746 (Pa. 2015). The test is whether the evidence admitted at trial supports the jury's finding of all the elements of the offense beyond a reasonable doubt. *Id.* The entire trial record must be evaluated and all evidence received must be considered. *Commonwealth v. Woods*, 638 A.2d 1013, 1015 (Pa.Super. 1994) (citing *Commonwealth v. Price*, 610 A.2d 488 (Pa.Super. 1992)). In reviewing the sufficiency of the evidence, all reasonable inferences must be drawn in favor of the Commonwealth as the verdict winner. *Commonwealth v. Mitchell*, 902 A.2d 430, 444 (Pa. 2006), *cert. denied*, 549 U.S. 1169 (2007).

## A. The evidence was sufficient to support a conviction for endangering the welfare of a child because Appellant owed a duty of care or protection to the children.

Appellant's first contention is that the evidence was insufficient to support his conviction for endangering the welfare of a child, arguing that the Commonwealth did not present evidence that showed Appellant was a parent, guardian, or person supervising the welfare of the children. Thus, Appellant argues, he could not have violated any duty of care, protection, or support to the children. Under the statute, "[a] parent, guardian or other person supervising the welfare of a child under 18 years of age . . . commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S.A. § 4304(a)(1).

7

There is no evidence that Appellant was either a parent or legal guardian of any of the children. Thus, in order to convict him of endangering the welfare of a child, the finder of fact would need to conclude that he was a "person supervising the welfare of a child." The statute defines "person supervising the welfare of a child" as "a person other than a parent or guardian that provides care, education, training or control of a child." 18 Pa.C.S.A. § 4304(a)(3). This supervision is not limited to certain forms, such as direct or actual supervision, but instead "encompasses all forms of supervision of a child's welfare." *Commonwealth v. Lynn*, 114 A.3d 796, 824 (Pa. 2015). Furthermore, the statute is "protective in nature, and must be construed to effectuate its broad purpose of sheltering children from harm." *Id.* at 818 (citing *Commonwealth v. Mack*, 359 A.2d 770, 772 (Pa. 1976)).

The Superior Court previously held that an adult who voluntarily resides with a minor child and violates a duty of care, protection, or support is within the scope of 18 Pa.C.S.A. § 4304(a)(1). *Commonwealth v. Brown*, 721 A.2d 1105, 1107-08 (Pa.Super. 1998) (citing *Commonwealth v. Kellam*, 719 A.2d 792, 796 (Pa.Super. 1998) ("[W]henever a person is placed in control and supervision of a child, that person has assumed such a status relationship to the child so as to impose a duty to act.")).[1] In *Brown*, the Court reviewed a challenge to the sufficiency of the evidence supporting a conviction for the child endangerment statute. *Brown*, 721 A.2d at 1108. The Court upheld the conviction where the defendant's relationship with the child consisted only of periodic babysitting, diaper changing, and playing with the child. *Id.*

---

[1] "Deciding that adults who share a residence with a child not in their legal custody are not responsible for the welfare of that child would undermine both the language and application of the endangering statute. Under such a limited reading, stepparents, grandparents, adult siblings, adult roommates, life partners, and others *could not* be prosecuted for endangering the welfare of a child. Our courts should not and have not limited the scope of the statute to exclude this broad and diverse category of persons.... By stating that such persons are contemplated within the scope of the statute, we do not hold that all adults residing with minor children are *automatically* criminally liable under this law, but rather that, as a matter of law, they are not *outside* of the scope of the statute. In order to establish the second element of the crime, the prosecution must prove that the adult had a duty of care, protection, or support of that child which they violated." *Brown*, 721 A.2d at 1107-08 (Pa.Super. 1998).

8

Thus, this level of interaction with the child was sufficient to deem the defendant a "person supervising the welfare of a child." 18 Pa.C.S.A. § 4304(a)(1).

In the present case, Appellant's relationship with the complainant's children was equally close, if not closer, to that described in *Brown*. Zackarie, the complainant's son, testified that Appellant had been living at the apartment with them for somewhere between six and nine months prior to March 30, 2014, and that he considered Appellant a friend. N.T. 10/22/15 at 88-90. Zackarie also testified that Appellant helped his mother around the house, including driving the boys to school and cooking dinner. *Id.* at 89-90. Likewise, the complainant testified that Appellant was her boyfriend at the time of the incident, and that he stayed with her and her sons periodically between April 2013 and March 30, 2014. *Id.* at 110-11, 140. She also stated that Appellant helped her with her children, including cooking for them and helping them with their schoolwork. *Id.* at 139-40. Appellant's interaction with the complainant's children clearly went well beyond that of the babysitting, diaper changing, and playing as described in *Brown*. 721 A.2d at 1108. Thus, the evidence was sufficient for the jury to find that Appellant was a "person supervising the welfare of a child." 18 Pa.C.S.A. § 4304(a)(1).

**B.** **The evidence was sufficient to support a conviction for endangering the welfare of a child because the welfare of the children was endangered during the incident between Appellant and the complainant.**

Appellant next argues that the evidence was insufficient to support a conviction for endangering the welfare of a child because the evidence did not establish that any child's welfare was endangered during the incident between himself and the complainant. This argument, too, lacks merit. The statute does not require actual physical injury to a child. *Commonwealth v. Wallace*, 817 A.2d 485, 491 (Pa.Super. 2002). Nor does it require that a child be in "imminent threat of physical harm." *Id.* Instead, the accused must be aware that his violation of his duty of

9

care or protection to the child is practically certain to result in the endangerment of the child's welfare. *Id.* at 492.

The Superior Court has established three elements that must be present to prove this element of the statute: the accused (1) is aware of his duty to protect the child; (2) is aware that the child is in circumstances that threaten the child's physical or psychological wellbeing; and (3) has either failed to act or has taken actions "so lame or meager that such actions cannot reasonably be expected to protect the child's welfare." *Commonwealth v. Retkofsky*, 860 A.2d 1098, 1099-1100 (Pa.Super. 2004) (citing *Wallace*, 817 A.2d at 490–91).

Applying these three elements to the present case, it is clear that Appellant knowingly endangered the welfare of the children. First, Appellant was aware that he had a duty to protect the children. Given that he lived at their apartment, prepared their meals, and drove them to school, it is implausible that he did *not* know of this duty.

Second, Appellant was aware that he placed the children in a situation that threatened their physical or psychological welfare. By staying at the apartment as a fugitive, as well as physically and verbally abusing their mother, Appellant created a dangerous environment in the apartment. *Id.* at 124-27; N.T. 10/23/15 at 65. Furthermore, when the police arrived in response to the complainant's phone call, Appellant made a deliberate effort to keep the police out by barricading the door with objects, speaking in a feminine voice to convince the police that the situation was resolved, silencing the complainant's screams for help by beating her, and telling the children not to open the door. N.T. 10/22/15 at 51, 77-78, 81, 122-23, 125, 209. In addition, he called her children "motherfuckers" and threatened to kill them if they did not return to their bedrooms. *Id.* at 124-25, 190-91. Although none of the children were physically injured, Zackarie testified to feeling "confused" and "traumatized" by the incident, especially after seeing

10

his mother bleeding and hysterical. *Id.* at 85. Accordingly, it is clear that Appellant understood that he was jeopardizing the children's physical and psychological wellbeing. *Retkofsky*, 860 A.2d at 1099-1100.

As to the third element, Appellant did not take any actions to protect the children's welfare. Instead, he created a dangerous situation in the apartment and was a physical and emotional threat to the children and their mother. And by making efforts to keep the police out of the apartment, Appellant exacerbated the potential danger of the situation. N.T. 10/22/15 at 127.

## C. The evidence was sufficient to support a conviction for unlawful restraint because the complainant was deprived of her freedom to leave the apartment and was exposed to the risk of serious bodily injury.

The unlawful restraint statute requires that a person knowingly restrain another "unlawfully in circumstances exposing [her] to risk of serious bodily injury." 18 Pa.C.S.A. §2902(a)(1). A defendant must "put another in actual danger of serious bodily injury." *Commonwealth v. Schilling*, 431 A.2d 1088, 1091-92 (Pa.Super. 1981). Appellant argues that the evidence did not sufficiently establish that the complainant was deprived of her freedom to leave the apartment or that she was placed in danger of suffering serious bodily injury.

In *Commonwealth v. Moody*, 441 A.2d 371, 374 (Pa.Super. 1982), the Superior Court affirmed a conviction for unlawful restraint where the victim "was forcibly detained . . . against her will, was threatened by [the defendant], struck by him, and . . . forcibly resisted his actions." The Superior Court held that based upon this evidence, the trial court "could have reasonably inferred that [the victim] was being restrained . . . ." *Id.*

Similar to the facts described in *Moody*, Appellant in the present case detained the complainant against her will, threatened her, and struck her while she resisted his actions. He also told her she could not leave, following her around the apartment and holding her keys and

11

phone. N.T. 10/22/15 at 118, 120. Furthermore, when the police arrived, he barricaded the door and told the complainant's sons not to remove anything or open the door. *Id.* at 82-83. Under these circumstances, Appellant clearly restrained the complainant and deprived her of her freedom to leave the apartment.

The evidence also sufficiently demonstrated that Appellant exposed the complainant to the risk of serious bodily injury. He told her multiple times that he was going to kill her and her sons. *Id.* at 116-17, 124-25, 127 190-91. He struck and assaulted her in various ways, causing lacerations on her lip and bruising on her neck. He spat in her face, smacked her, and tried to silence her screams by holding a pillow over her face, holding his hands over her mouth and nose, shoving a washcloth in her mouth, and choking her. *Id.* at 116-17, 122-23, 126-27.[2]

---

[2] Although Appellant may argue that he could not have detained the complainant in her own apartment, the Superior Court previously struck down a similar argument in *In re M.G.*, 916 A.2d 1179, 1182 (Pa.Super. 2007). In that case, the Court rejected the defendant's argument that because the incident occurred in the victim's own bedroom, he could not be convicted of unlawful restraint. *Id.* "Whether in her own home or elsewhere, [the defendant] restrained [the victim] and kept her in an area where she did not wish to remain." *Id.* (citing *Commonwealth v. Prince,* 719 A.2d 1086, 1089 (Pa.Super. 1998) (finding that the evidence supported unlawful restraint conviction where the victim was attacked in her own home and where she stayed near the defendant all night out of fear for her safety)).

12

## CONCLUSION

After review of the applicable statutes, testimony, and case law, there is sufficient evidence to find Appellant guilty of all offenses. Accordingly, the trial court's decision should be affirmed.

**BY THE COURT:**

*Diana L. Anhalt* (signature)

**DATE: JULY 20, 2016**

**DIANA L. ANHALT, J.**

13