J-S77042-18

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | : | |
| v. | : | |
| AMBER R. FLOYD, | : | |
| Appellant | : | No. 3507 EDA 2016 |

Appeal from the Judgment of Sentence October 6, 2016
in the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0008317-2015

BEFORE:    OTT, J., DUBOW, J. and STRASSBURGER, J.*

MEMORANDUM BY STRASSBURGER, J.:          **FILED MARCH 07, 2019**

Amber R. Floyd (Appellant) appeals from the judgment of sentence entered on October 6, 2016, after she was found guilty of endangering the welfare of a child (EWOC) and recklessly endangering another person (REAP). We affirm.

The abovementioned charges arose out of two instances of police finding Appellant's then eight-year-old son, C.F., home alone. The first instance occurred on March 4, 2015. As summarized by the trial court, on that day at approximately 7:45 a.m., City of Philadelphia Northeast Detective William Duboe

> and other law enforcement members arrived at 7811 Bradford Street, Apartment A, in Northeast Philadelphia to serve an Arrest Warrant upon Appellant's boyfriend[, Jerry]. The genesis of the warrant was Appellant's report to law enforcement that this paramour had assaulted and terrorized her inside the apartment

*Retired Senior Judge assigned to the Superior Court.

they had shared a few days earlier. Upon arrival, and after knocking several times on the front door, Detective Duboe observed a front curtain move. He announced that the door would be kicked if it was not opened. Immediately thereafter he observed a little boy open the curtain and peer through it.

Detective Duboe told this little boy to open the door. The child in response stated that he did not know if they were police. Amazed with the independence and wisdom of someone so young, the Detective promptly showed the child the marked police wagon and identification and a copy of the photograph of the person on the warrant. The child then permitted the entry of the officers. Upon entry, Detective [Duboe] checked the premises. No other persons were present.

Detective Duboe noted that the apartment was dirty and in complete disarray with numerous dead and live roaches visible on the counters and in the kitchen particularly covering chicken left for the child's lunch uncovered. Trash was strewn throughout the premises. The apartment lacked any furniture whatsoever except for a mattress box spring that was on the floor of a single bedroom. The Detective was aware that Appellant had reported to law enforcement as part of her prior complaint that her boyfriend had broken the television in their prior altercation.

Initially this child, who was later identified as Appellant's [son, C.F.,] told law enforcement that "[Appellant] would be right back and that she was at work." After the Detective waited almost two hours for some responsible adult to appear, C.F. "blurted out that [Appellant] leaves him home by himself all the time." C.F. told Detective Duboe that he was home because he had off from school on this regular school day. He showed the Detective while waiting for [Appellant] to appear, that he had been reading bus schedule[s]. Detective Duboe testified that "[C.F.] said that's what kept him busy all day. So there was no radio, TV or nothing. There was about 50 bus schedules on the bed. That's all he did was read them all day. He's a pretty smart kid because he knew all the bus routes."

There was no telephone in the apartment and C.F. had no cellular phone. C.F. sta[ted] that he did not know any telephone number to reach [Appellant]. He did not have any information concerning her place of work. After almost two hours into the wait time, C.F. provided the officers a telephone number for an "uncle."

- 2 -

When the officer called the number, a male answered and acknowledged that he was a relative and stated that he would appear. No one arrived.

After they could wait no longer and after unsuccessfully reaching someone within the Philadelphia Department of Human Services Child Protection Division, Detective Duboe made the decision to take C.F. to Northeast Detectives, feed him and then transport him to the Special Victim's Unit for an interview. During this entire period no adult arrived or telephoned police department on behalf of C.F.

Philadelphia Special Victim's Unit Officer Migyon Wilson established that on March 4, 2015 she had interviewed C.F. at about 11:00 a.m. She said during the entire period that C.F. was in her presence, no adult came to claim [C.F.]. Thereafter, C.F. was transported via uniformed police officers to the Center City Philadelphia Department of Human Services Child Protection Division location.

Trial Court Opinion, 6/28/2018, at 4-6 (citations omitted).

Appellant testified that during the relevant periods of time she was employed as a financial analyst at a company located fifteen minutes from her apartment. N.T., 6/10/2016, at 21. Appellant also confirmed that during the week prior to the March 4th incident, she had contacted police and obtained a temporary ex-parte protection from abuse (PFA) order against her former boyfriend Jerry after a violent altercation which resulted in Jerry breaking most of the furniture and Appellant's cellphone. *Id.* at 22-23, 32-33. Jerry also stole C.F.'s phone. *Id.* at 33.

Appellant testified that on March 4th she had arranged for her friend Lisa to travel from the Frankford section of Philadelphia to watch C.F.[1] *Id.* at 21 Although this was a regular school day, Appellant explained that C.F. was home because he had been "suspended from school for behavioral issues that he was having, due to" witnessing the altercation between Appellant and Jerry. *Id.* at 22. Appellant testified that she had spoken to Lisa shortly before she left for work around 7:30 a.m., and Lisa told her that she would be arriving shortly. *Id.* at 23-24. Appellant testified that Lisa did not end up showing up because she had encountered weather-related travel troubles that prevented her from making it to Appellant's apartment. *Id.* at 40.

> Appellant testified that her apartment had been in disarray and without furniture because [she was] "trying to get it together" after the breakup. Appellant agreed that there was no telephone landline in the apartment and that [C.F.] had no phone to call anyone if needed while alone. Appellant recalled that she had received notice from the Department of Human Services after completing her full day at work after 5:00 [p.m.] She remembered that [C.F.'s] older cousin had picked [C.F.] up from the Department of Humans Services location that day.

Trial Court Opinion, 6/28/2018, at 10 (citation omitted).

---

[1] Appellant testified that she would often ask Lisa, maternal grandmother or other relatives to watch C.F. in her absence. Appellant averred Lisa had previously watched C.F. over a dozen times. *Id.* at 24, 26-27. Neither Lisa nor any other family members testified at trial.

- 4 -

Following this incident, an arrest warrant was issued for Appellant on

May 25, 2015, charging her with EWOC and REAP.[2]  As further summarized

by the trial court, evidence presented at trial

> demonstrated that Appellant, despite being under the microscope
> of the [DHS] and law enforcement, inexplicably continued to
> dangerously neglect [C.F.] until at least June 15, 201[5].  Special
> Victims Unit Detective Justin Montgomery credibly testified that
> on June 15, 2015 at approximately 3:15 p.m. he had travelled to
> 7811 Bradford Street, Apartment A, Philadelphia, PA to serve and
> execute the arrest warrant upon [Appellant.]
>
> After knocking and determining no one was home, he waited
> in his police vehicle. He then saw C.F. walking alone northbound
> on Bradford Street, approach the apartment, look up and down
> the street and gain entry with a key. Detective Montgomery
> knocked again several times and when C.F. finally opened up the
> apartment [he provided identification] to C.F. and asked if anyone

---

[2] Although it is not entirely clear from the record, it appears from the
transcripts and Appellant's brief that a Department of Human Services (DHS)
investigation was opened as a result of this incident and as a result, C.F.'s
maternal grandmother received physical and legal custody of C.F.  **See** N.T.,
10/6/2016, at 16 ("At this point there is a stipulation by and between counsel
that if called to testify that Deputy City Solicitor, Angela Yancey would say
that [s]he reviewed the DHS records regarding  [C.F.] and determined that no
investigation was open as a result of the incident in this trial, because at the
time, [C.F.] was in the legal custody of his maternal grandmother.");
Appellant's Brief at 11 (DHS "was the legal and physical custodian of [C.F.] on
June 15, 2015[]" and had transferred custody to C.F.'s maternal
grandmother). With respect to maternal grandmother,

> Appellant testified that [maternal] grandmother had [] been
> staying with her temporarily in March 2015. Specifically, she
> stated "I originally got the apartment on Bradford Street October
> of 2013. My mom stayed with me in the apartment up until I want
> to say January 2014. After that it was just me and C.F.[] She
> would come by periodically and stay for a few days, leave; stay a
> few days, leave." She reported that C.F.'s grandmother rented a
> room in a different section of the city.

Trial Court Opinion, 6/28/2018, at 10.

was home. C.F. was alone and the property appeared empty. [Detective Montgomery] called to inform Officer Wilson of his findings and waited for additional officers to provide transportation of C.F. to the Special Victims Unit.

While waiting for the arrival of someone on [C.F.'s] behalf, C.F. asked if he could retrieve his backpack and money left on the counter for his dinner. He told the Detective that [Appellant] was at work and would be right back. The physical condition of the apartment appeared to be cluttered. There [were] limited items of furniture including a television. Numerous plates of old food and drinks [were] scattered about the kitchen and dining room. When asked about the living conditions, Detective Montgomery responded "I would consider the living conditions livable, but not suitable for a child that age just due to the older food stuff left around in different stages of decomposition." Officer Wilson who had interviewed C.F. in March also reported that she had interviewed C.F. again in the early evening of June 15, 2015 at the Special Victims Unit. C.F. was fed his dinner by law enforcement while waiting for someone to collect him.

* * *

[Appellant] acknowledged that [] C.F. had been attending school at the time and that she had prearranged for two cousins to be with him while she was at work. She claimed a belief that at the time of arrival of the police officers those cousins had been at a nearby WaWa getting [C.F.] food. This was directly in contrast to the evidence that money for C.F.'s food was on the counter at the time of the Detective's arrival and that C.F. had asked to bring it with him to Special Victim's Unit to buy food for himself. On that date in June[,] Appellant stated that she had received a call from the Special Victim's Unit about 5:00 p.m. on her way home from work.

*Id.* at 7-8, 10 (citations omitted). With respect to these incidents, C.F., now ten years old, contradicted his previous statements made to police and testified that each time police had encountered C.F. home alone, family members or friends were responsible for taking care of him. N.T., 6/10/2016, at 20-24, 32-33.

C.F. admitted also that his belief, that other people that he had believed were responsible for his care including his cousins, his grandmother, or friends of his mother, was based upon the information that [Appellant] had told him after her arrest. V.F.'s prior written, signed and adopted previous inconsistent statement were introduced into evidence via direct and cross-examination of C.F. and subsequently through the interviewer Officer Wilson. These previous statements firmly corroborated the sad truth that [C.F.] had been dangerously left to his own devices for an extended period of time and was quite used to [Appellant's] pattern of behavior.

Trial Court Opinion, 6/28/2018, at 6 (citations omitted).

No additional charges were filed based upon this incident, but in the criminal information, the Commonwealth listed both March 4, 2015, and June 16, 2015, as the offense dates to support the EWOC charge.

Following a non-jury trial, Appellant was found guilty on both charges. On October 6, 2016, after waiving a pre-sentence investigation, Appellant was sentenced to an aggregate term of four years' reporting probation. Appellant timely filed a notice of appeal on November 4, 2016.[3] On appeal, Appellant challenges the sufficiency of the evidence to sustain her EWOC conviction. Appellant's Brief at 7.

We begin our review of Appellant's claim mindful of the following.

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond

---

[3] Both Appellant and the trial court complied with Pa.R.A.P. 1925. According to the trial court, the transcripts in this case were not completed until May 2018, accounting for the lengthy delay between when Appellant filed her notice of appeal and when the trial court authored an opinion pursuant to Pa.R.A.P. 1925(a). Trial Court Opinion, 6/28/2018, at 3.

a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

Further, in viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, the court must give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Harden*, 103 A.3d 107, 111 (Pa. Super. 2014) (internal quotation marks and citations omitted).

[T]o support a conviction under the EWOC statute, the Commonwealth must establish each of the following elements: (1) the accused is aware of his/her duty to protect the child; (2) the accused is aware that the child is in circumstances that could threaten the child's physical or psychological welfare; and (3) the accused has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare.

*Commonwealth v. Wallace*, 817 A.2d 485, 490–91 (Pa. Super. 2002) (internal quotation marks omitted). Furthermore, EWOC "constitutes a felony of the third degree" if the accused "engaged in a course of conduct" which continued to endanger the welfare of the child. 18 Pa.C.S. § 4304(b)(1)(ii).

- 8 -

Appellant avers the Commonwealth failed to present sufficient evidence that she had engaged in a continuing course of conduct to support a felony grading of EWOC.[4]  Appellant's Brief at 10.  Specifically, while Appellant concedes there was sufficient evidence to support a finding of EWOC regarding the March 4, 2015 incident, Appellant contends that because DHS became the legal and physical custodian of C.F., who then transferred custody to maternal grandmother prior to the June 15, 2015 incident, Appellant did not have legal or physical custody of C.F. and as such, did not owe a duty of care to C.F.  *Id.* at 11.  Therefore, Appellant argues, she could not have been found to have endangered the welfare of a C.F. in June 2015, and without this second incident of child endangerment, the Commonwealth could not have proven that Appellant engaged in a continuing course of conduct to support a third-degree felony conviction.  *Id.* at 12-13.

"Although the EWOC statute does not define 'course of conduct,' the phrase is clearly used in that context to differentiate the penalties for single

---

[4] Additionally, Appellant contends the Commonwealth failed to prove Appellant was aware of: (1) her duty of care to C.F., and (2) that the circumstances surrounding the June 2015 incident posed a threat to C.F. and endangered his well-being.  Appellant's Brief at 12-13.  Upon our review of the record, we find these claims waived for Appellant's failure to preserve properly these arguments in her 1925(b) statement.  **See** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").  **See also Commonwealth v. Poncala**, 915 A.2d 97, 100 (Pa. Super. 2006) ("[A]s a general rule, the failure to raise an issue in an ordered Rule 1925(b) statement results in the waiver of that issue on appeal.").

and multiple endangering acts." ***Commonwealth v. Kelly***, 102 A.3d 1025, 1031 (Pa. Super. 2014)

> "Course of conduct" is defined in multiple instances elsewhere in the Crimes Code and, in each of those instances, "course of conduct" implies more than one act over time. ***See*** 18 Pa.C.S. § 2709(f) (defining "[c]ourse of conduct" as used in the statute defining the offense of harassment as "[a] pattern of actions composed of more than one act over a period of time, however short, evidencing a continuity of conduct"); 18 Pa.C.S. § 2709.1(f) (defining "[c]ourse of conduct" as used in the stalking statute as "[a] pattern of actions composed of more than one act over a period of time, however short, evidencing a continuity of conduct"). Although recognizing that the harassment and stalking statutes provide a statutory definition for the phrase, this Court has "explained that '[c]ourse of conduct by its very nature requires a showing of a repetitive pattern of behavior.'"

***Id.*** at 1030–31 (some citations omitted). "Particularly with this offense, the logical interpretation of the legislative language in subsection (b) is that it is designed to punish a parent who over days, weeks, or months, abuses his children, such as repeatedly beating them or depriving them of food." ***Commonwealth v. Popow***, 844 A.2d 13, 17 (Pa. Super. 2004).

In its 1925(a) opinion, the trial court offered the following analysis, concluding that even without the second incident, the Commonwealth satisfied the course-of-conduct element.

> In the instant matter, competent evidence had been introduced by the Commonwealth [] to prove beyond a reasonable doubt that Appellant had knowingly engaged in course of conduct that had endangered [C.F.] by repeatedly violating her duty as his biological parent during extended periods in March of 2015 as well as in June of 2015.
>
> It was undisputed that Appellant was the biological mother of [C.F.] and that as his mother she had owed a duty of care to

- 10 -

him. The testimony from all persons including Appellant established that Appellant and C.F. lived on their own in the apartment and more importantly that Appellant had assumed natural parental responsibility for her son. The fact that there was an Order entered at some unknown date granting C.F.'s maternal grandmother physical custodial rights or responsibilities did not minimize or absolve Appellant from her duties in any manner.

It was plainly apparent from C.F.'s independent behavior within the deplorable conditions observed by Detective [] Duboe coupled with C.F.'s recorded statements, that [C.F.] had been left alone for long and multiple lengths of time by [Appellant] to fend for himself well before March 4, 2015 at approximately 7:45 a.m. when law enforcement members arrived at 7811 Bradford Street, Apartment A, in Northeast Philadelphia to serve an arrest warrant. It was plainly apparent that C.F. had already grown accustomed to being left alone to cook and care for himself long before the first arrival of law enforcement at his door. C.F.'s [] survival skills demonstrated that he had already been dangerously thrown into the ocean of life with only his wits as his life vest at far too young of an age.

Appellant's testimony revealed that she knowingly left her son alone in February and March without any means to reach out for help via telephone immediately after this child demonstrated that he had been emotionally and severely traumatized by the violence he had witnessed between Appellant and her boyfriend. Instead of obtaining some form of help for [C.F.], she left him in the same insect ridden, filthy apartment that she had reported had been ransacked by the boyfriend just the week before the appearance of the officers. [Appellant] unconscionably left her [C.F.] vulnerable to the same man from whom she had expressed fear of future violence and reprisal. As early as March of 2015, the continuing course of conduct as the statutory element that raised the offense of [EWOC] to a third degree felony already been firmly established with the evidence gleaned from events on March 4, 2015.

The return of law enforcement on June 15, 2015 however exposed the sad truth that Appellant had not significantly altered her ongoing and harmful neglect of her son. Once again [C.F.] was observed acting independently of any adult supervision or care. He had walked home alone from school armed only with the locks to the apartment. Money was left for him to pay for and cook his

own meals and singularly occupy his free time. The conditions as reported by law enforcement in the apartment, although slightly improved, was still in disarray and not suitable as a child's residence. C.F.'s responses echoed Appellant's lies to cover her abdication of her parental responsibilities.

Just as an extraction needle reflects what had been flowing in a person's veins, each observation of each testifying officer from both periods of time proved beyond a reasonable [doubt,] the continuing course of Appellant's abhorrent conduct. Moreover, Appellant's attempts to disguise her dangerous neglect by filling [C.F.'s] brain with false memories illuminated her consciousness of guilt. Appellant knowingly and continually deprived [C.F.] of a naturally developed childhood. Sufficient evidence supported the guilty verdicts for each charge as graded.

Trial Court Opinion, 6/28/2018, at 12-14.

Upon our review of the record, we conclude Detective Duboe's observations in March 2015 of C.F. alone in an apartment with deplorable conditions,[5] coupled with the Detective's testimony that C.F. had disclosed to Detective Duboe that Appellant frequently left him alone, if believed by the finder of fact, was sufficient to establish that Appellant engaged in a continuing course of conduct that endangered the welfare of C.F.

Additionally, we find the June 2015 incident to be further evidence of Appellant's continuing conduct. In concluding as such, we disagree with Appellant's argument that because she did not have legal or physical custody of C.F., she did not owe a duty of care to him, a necessary element under the EWOC statute. This Court has held that a duty of care is not limited solely to

---

[5] As noted *supra*, Appellant concedes there was sufficient evidence to support a finding of EWOC regarding the March 4, 2015 incident. Appellant's Brief at 11.

- 12 -

parents or guardians with custodial rights. *See Commonwealth v. Kellam*, 719 A.2d 792, 796 (Pa. Super. 1998) ("In this age where children reside in increasingly complex family situations, we fail to understand why criminal liability should be strictly limited to biological or adoptive parents. In the instant case, appellant resided with the victim and her mother, exercised a great deal of control over the mother, and voluntarily assumed parental responsibilities with regard to the child. We therefore hold that whenever a person is placed in control and supervision of a child, that person has assumed such a status relationship to the child so as to impose a duty to act.").

Here, the evidence established that while Appellant did not have legal or physical custodial rights to C.F. at the time of the June 2015 incident, Appellant and C.F. were living together and maternal grandmother, who had custody of C.F., only stayed at the apartment periodically. Appellant, through her own testimony, acknowledged that she was aware when C.F. was going to be home alone during certain hours and testified that she had arranged for C.F. to be cared for by friends and other family members when she was at work. Although it is clear the trial court did not credit Appellant's version of events with respect to setting up care for C.F. in her absence, Appellant's testimony firmly established that she assumed the parental responsibility of C.F. and was aware of and had a duty to, care for C.F. during the relevant period of time.

Because we find Appellant owed a duty of care to C.F. in June 2015, the evidence and testimony at trial concerning both the March 4, 2015 and June 15, 2015 incidents were sufficient to establish a continuing course of conduct, warranting a third-degree felony grading. As such, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.

Prothonotary

Date: 3/7/19