689 A.2d 963

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Tammy Sue PAHEL, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 10, 1996.

Filed Feb. 24, 1997.

Bruce A. Barrett, Assistant Public Defender, Meadville, for appellant.

Debra S. Higgins, Assistant District Attorney, Meadville, for Commonwealth, appellee.

Before POPOVICH, FORD ELLIOTT and HESTER, JJ.

POPOVICH, Judge:

The appellant, Tammy Sue Pahel, appeals the judgment of sentence (3–24 months less 1 day imprisonment) for endangering the welfare of her child. We reverse.

The facts, viewed in a light most favorable to the verdict-winner and drawing all reasonable inferences therefrom, reveal that on the morning of February 8, 1995, Dr. Ronald M. Unice examined 5–year–old Timothy Pahel. The doctor noticed "significant facial injuries," which x-rays revealed were nasal fractures manifested by marked swelling on the nasal bridge, with discoloration of the nose and marked discoloration under both eyes. Consistent with the injuries, the doctor opined that some type of force ("trauma") to the face caused bleeding and discoloration. Given such events, the witness was concerned that the appellant did not recall the child crying or bleeding. "Simply that all of a sudden, one day, on this day, the 5th [of February, 1995 (a Sunday)], the [appellant] noticed changes in the [child's] face." N.T. 29.

Despite the "changes" observed by the appellant, she waited two days (until February 7th) to secure a doctor's appointment for February 8th. It was Dr. Unice's belief that the victim "needed urgent attention, either in the emergency room or a doctor's office" because the amount of trauma needed to inflict

a nasal fracture could have caused injury to the brain. *Id.* at 35. Therefore, it was the expert's opinion that "potentially" the child's welfare was endangered because his facial injuries "could have led to very serious problems." *Id.* at 33.

The jury found the appellant guilty, and, on appeal, the appellant raises three issues for our consideration, the first two of which question the sufficiency of the evidence in that the prosecution failed to show that she "knowingly" violated 18 Pa.C.S.A. § 4304 [1].

■ To establish a violation of Section 4304 requires proof that:

1) the accused is aware of his/her duty to protect the child;

2) the accused is aware that the child is in circumstances that could threaten the child's physical or psychological welfare; and

3) the accused has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare.

*Commonwealth v. Cardwell,* 357 Pa.Super. 38, 515 A.2d 311, 315 (1986). If the Commonwealth fails to prove any one of these elements, there is insufficient evidence to sustain a conviction for child endangerment. *Commonwealth v. Miller,* 411 Pa.Super. 33, 600 A.2d 988, 990 (1992). It is the appellant's position that the prosecution failed to establish the second and third prongs of the elements set forth above to prove her guilt.

We begin our review with *Cardwell,* supra, where this Court held that the specific intent element of Section 4304 was not negated when the appellant allowed her minor-child to stay in the same household with her abuser/stepfather for ten months after learning of the abuse. Also, writing two letters to the stepfather that such behavior would no longer be tolerated,

---

1. Section 4304 reads:

A parent, guardian, or other person supervising the welfare of a child under 18 years of age commits a misdemeanor of the second degree if he *knowingly* endangers the welfare of the child by violating a duty of care, protection or support.

18 Pa.C.S.A. § 4304 (Emphasis added).

applying for the child's transfer to another school and moving some of the child's clothing to the grandmother's home fell short of satisfying the appellant's duty to care for and protect the child.

The appellant's actions, albeit "something," were so feeble as to be ineffectual to negate the intent element needed to establish a violation of Section 4304. The *Cardwell* Court also added:

The affirmative performance required by § 4304 cannot be met simply by showing any step at all toward preventing harm, however incomplete or ineffectual. An act which will negate intent is not necessarily one which will provide a successful outcome. However, the person charged with the duty of care is required to take steps that are reasonably calculated to achieve success. Otherwise, the meaning of the "duty of care" is. eviscerated.

357 Pa.Super. at 46, 515 A.2d at 315. Hence, this Court ruled that the evidence was sufficient to show that the appellant "knowingly" endangered her child.

However, in *Miller*, supra, this Court reversed a conviction for endangering the welfare of a child and discharged the appellant on the basis that the evidence was insufficient to establish that the appellant "knowingly" allowed her twenty-two-month-old child to sleep unattended while she and the father went socializing on the strength of the father's untrue remark that the child would be watched by a tenant in the apartment building.

When the appellant returned, the apartment building had burned and the child died of smoke inhalation and burns caused by a defective space heater placed near the child for warmth. This Court found that the actions of the appellant were insufficient to prove the intent element of Section 4304. In doing so, we wrote:

We have difficulty in finding that the evidence is sufficient to satisfy the *Cardwell* tripartite test. While it is undisputed that appellant was aware of her duty to protect her child, we cannot find as a matter of law that she was aware that

she had placed her child in circumstances that threatened the child's physical or psychological welfare or that her failure to check on the alleged babysitting arrangements was unreasonable under *Cardwell.*

\* \* \* \*

It would appear that the trial court has based appellant's culpability under § 4304 not on the fact that appellant knowingly left her child alone, but rather that she should not have been so gullible as to believe [the father]. Undeniably, appellant may have exercised poor judgment on the night in question, and perhaps she is guilty of reckless or negligent conduct in connection with her son's death. However, this is not sufficient for a finding of guilt under § 4304. If appellant in fact believed that her son was in the care of another, she did not knowingly leave him unattended and thereby endangered, and her conduct cannot be adjudged criminal.

\* \* \* \*

Utilizing a common sense of the community approach to interpret the specific intent element of the statute, we find an implicit recognition that parents at times can make mistakes in judgment and that their children may be harmed as a result. However, for such mistakes to rise to the level of criminal culpability, parents must knowingly allow their children to be at risk with awareness of the potential consequences of their actions or of their failure to act.

411 Pa.Super. at 41, 600 A.2d at 991–92.

Finally, in *Commonwealth v. Ogin,* 373 Pa.Super. 116, 540 A.2d 549 (1988), the defendants/parents were convicted of, inter alia, endangering the welfare of their seventeen-month-old daughter by dragging and throwing the child against the wall of a building, twice striking the minor with a back-hand and pushing hot food in the child's face.

164

On appeal, the defendants alleged that the evidence was insufficient to establish that they "knowingly" endangered the welfare of the child. This Court, sitting en banc, found such argument to be meritless; to-wit:

> Section 4304 is a comprehensive provision designed to penalize those who knowingly breach a legal duty to protect the well-being of children who are entrusted to their care. *See Commonwealth v. Cardwell*, 357 Pa.Super. 38, 515 A.2d 311 (1986); *Commonwealth v. Taylor*. As we noted in *Taylor*:
>
>> The [Pennsylvania] Supreme Court has said that Section 4304 was drawn broadly to cover a wide range of conduct in order to safeguard the welfare and security of children. It is to be given meaning by reference to the common sense of the community and the broad protective purpose for which it was enacted. *Commonwealth v. Mack*, 467 Pa. 613, 618, 359 A.2d 770, 772 (1976).
>
> 324 Pa.Super. [420] at 426–27, 471 A.2d [1228] at 1231 [(1984)].
>
> Parents have a responsibility to advance the physical, mental, and emotional health of their children, and extreme acts or grave omissions which adversely affect a child may come within the scope of the statute.

\* \* \* \*

> Appellants also contend that by failing to provide a duty of protection, they did not *knowingly* endanger [their child's] welfare as required by section 4304.

\* \* \* \*

> The jury could have credited the Commonwealth's version of the events, and could have believed so much of the defense testimony as indicated that appellants knew that the conduct in question posed a threat to a child's welfare. Thus, the elements of the crime of endangering the welfare of children were established.

373 Pa.Super. at 124, 540 A.2d at 553–54. Under *Ogin,* to come within the scope of Section 4304, a parent may engage in "extreme acts or grave omissions which *adversely affect a child,*" or, despite not sustaining serious injury, the parent "knew that the conduct in question posed a threat to a child's welfare."

▪ Here, the Commonwealth's expert testified that the delay in producing the child for examination *did not adversely affect* the child. In fact, in response to the question "If you had seen [the child] on February 5th [instead of February 8th], would your treatment have been the same" was answered by the doctor: "The treatment would have been essentially the same at that point." N.T. 36. Furthermore, after making an initial observation that the child had sustained "significant" facial injuries manifested by swelling of the nasal bridge and discoloration under both eyes, the child was examined by the doctor and found "overall, his condition otherwise was fairly good." *Id.* at 24.

Whether the appellant "knew" that her delay in having her son examined exposed the child to a threat of more serious harm, the doctor's report dated February 8th read that the appellant was not aware of any injury that had occurred to her son. *Id.* at 27, 39. The CYS worker who interviewed the parties testified that the appellant did not know how the child hurt his nose and the child was examined because a friend of the mother told her to seek medical attention. *Id.* at 47, 49, 60–61.

More specifically, the child's second cousin (Lillian Pruskowski) was phoned by the appellant on February 6th (a Monday) and informed that the child had fallen, his eyes were black and blue and his nose was swollen. Ms. Pruskowski advised the appellant to make a doctor's appointment, which occurred on February 7th. *Id.* at 65. Also, when the attending physician was asked whether the child's condition constituted an "emergency situation," he responded: "Not necessarily."[2] *Id.* at 41.

---

**2.** The relevant, complete exchange between the assistant district attorney and the physician consisted of the following:

In fact, it took an x-ray to detect the presence of a nasal fracture [3]. *Id.* at 36. Even with the x-ray, the doctor saw no need to administer medication or splint the fracture.

The evidence of intent to violate Section 4304 came via the testimony of the child's physician and second cousin. In both instances, the appellant said she did not know how the child became injured, but medical treatment was sought after speaking with Ms. Pruskowski. And, the treatment would have been no different had the child been brought to the office on the day of the event (February 5th, a Sunday) versus the child's scheduled visit on Wednesday, February 8th.

The fact that a medical professional was able to evaluate the child's injuries and conclude that the failure to obtain prompt medical attention "potentially" endangered the child's welfare [4] is not illuminating on whether the appellant had "knowledge" that delay in seeking medical treatment placed the child at risk or that the appellant was aware of the potential consequences of her actions. To hold thusly would require assigning each parent with the skill and knowledge of a medical professional in matters of care associated with childhood injuries. Every parent whose child is injured (no matter how minor) would have to seek, under penalty of law, immediate medical treatment to dispel (as stated by the Commonwealth's expert) the mere "potential" threat to a child's welfare, even

Q. Sure. In your professional medical opinion, was this an emergency situation that called for Emergency Room treatment rather than a normal checkup appointment?
A. Not necessarily. I would say it needed urgent attention, either in an Emergency Room or a doctor's office, he could be seen rather quickly.
N.T. 41 (Emphasis added).

3. Visual observation of the nose did not evidence a fracture. The physician testified that: "You can't look grossly at a nose when it's swollen and know whether it's broken or not unless there is a deviation." N.T. 36. This condition ("deviation") was not exhibited by the minor-child. *Id.* at 36.

4. The "risk" attendant to the nasal fracture was brain damage. N.T. 34. However, the Commonwealth's expert could only testify that there was a "potential" for head injury associated with a facial fracture, but there were no signs that this was the case here. Thus, we may not attribute the appellant with "knowledge"

when the parent is unaware of the course of events that could be set in motion by the injury sustained.

We must not rush to judgment anytime and everytime a minor suffers an injury that is not medically attended to immediately. Ideally, each and every injury of a minor-child should not go unattended, but the alacrity with which one acts to seek medical intervention, diagnosis or abatement of an injury is in the first instance for the parent to decide, allowing for review by the courts when a parent is found guilty of violating Section 4304.

Accordingly, consistent with the precepts recited in *Miller*, *Ogin* and *Cardwell*, we conclude that the evidence is not sufficient to establish beyond a reasonable doubt that the appellant "knew" her three-day delay in seeking medical attention for the minor-child created a risk, with awareness of the potential consequences ("serious head injuries"), to the child's welfare.

Judgment of sentence reversed.[5] Appellant discharged.

FORD ELLIOTT, J. files a concurring statement in which POPOVICH, J. joins.

FORD ELLIOTT, Judge, concurring.

I agree with the majority that the Commonwealth failed to sustain its burden of proving appellant endangered the welfare of her child by her failure to seek prompt medical attention. As the majority aptly notes, the element of scienter is clearly

---

5. Our disposition of the appellant's sufficiency issue dispenses with the need to address the appellant's remaining claim, which consists of three sub-issues assigning error: 1) to the trial court in not granting a mistrial when a witness for the prosecution testified that the appellant was "worrisome when it came to CYS because she had just got[ten her other child] Jamie back"; 2) in allowing the prosecution to read in her closing argument inconsistent remarks contained in the appellant's police statement (of the victim having and not having blood shot eyes); and 3) in allowing the prosecution to argue to the jury that the appellant had the burden of proof.

Were we to respond to the appellant's complaint, we would find that the trial court's opinion at pages 7 through 11 represents an adequate reply to the appellant's claims and adopt it as our own in finding them meritless.

lacking. I write separately, however, to express my concern, based on the record in this case, that the court remain vigilant to ensure the protection of this child.

The original complaint filed by the Commonwealth indicates that appellant was initially accused of endangering the welfare of her child by failing to protect the child, *and* by failing to seek medical attention for the child. (R. at 1.) The charge of failing to protect the child was, however, crossed out, and appellant was eventually charged only with failure to seek medical attention. (R. at 2.) Nevertheless, the affidavit of probable cause to arrest indicates that the child told the CYS worker, the police officer, and the child's second cousin that appellant's boyfriend hit the child's face with a stick. (R. at 1.) Testimony from the second cousin also indicates that appellant did not want to send the child to school with black and blue eyes the Monday following the incident in question because appellant feared CYS involvement. (Notes of testimony, 11/1/95 at 60.)

The record further indicates that the police filed charges against appellant's boyfriend in connection with the incident in question. (*Id.* at 80). A jury was sworn in the case against boyfriend at *Commonwealth v. Eric Boyer*, No.1995–637, Crawford County; however, the jury was dismissed and the case *nolle prossed* due to the unavailability of a witness.

It is clear from the foregoing that, while the Commonwealth apparently lacked evidence to prosecute appellant for failing to protect her child from her boyfriend, there is enough evidence of record to suspect that this child, as well as others living with mother, may continue to be at risk. I write separately, therefore, to strongly suggest that the Family Division of the Crawford County Court of Common Pleas remain attentive to the welfare of this child, and to charge and direct Children and Youth Services to closely monitor the family in this case.

POPOVICH, J., joins in this concurring statement.