J-S36038-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CHARLES RAYMOND FAGAN | : | |
| | : | |
| Appellant | : | No. 944 WDA 2024 |

Appeal from the Judgment of Sentence Entered July 23, 2024
In the Court of Common Pleas of Blair County Criminal Division at No(s):
CP-07-CR-0001164-2019

BEFORE:   PANELLA, P.J.E., NICHOLS, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY FORD ELLIOTT, P.J.E.:        **FILED:  March 31, 2026**

Appellant, Charles Raymond Fagan, appeals the judgment of sentence imposed by the Court of Common Pleas of Blair County after a jury found him guilty of nine counts each of rape of a child, involuntary deviate sexual intercourse with a child, statutory sexual assault, and indecent assault of a person less than thirteen years of age, and single counts of involuntary deviate sexual intercourse by forcible compulsion and endangering the welfare of a child, in connection with his abuse of the minor daughter ("A.W.") of a woman in a romantic relationship with him, beginning when the victim was eight years old, and ending when she was thirteen years old.[1]  He challenges the trial

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 3121(c), 3123(b), 3122.1(b), 3126(a)(7), 3123(a)(1), and 4304(a)(1), respectively.

court's admission of statements by himself and the victim, and alleges that he was prejudiced by the denial of his pre-trial request for a continuance. Upon review, we affirm.

Appellant became a step-father-like figure to A.W. – she would call him, "Dad" – when he started dating her mother when A.W. was six years old. N.T. Trial, 3/4/24, 105, 188. The two of them were "extremely close" and would go camping and fishing together. *Id.* at 106. Appellant and A.W.'s mother "got engaged," and had a daughter together, who was seven years younger than A.W. *Id.* at 105-06, 188-89.

At trial, A.W. testified that Appellant had been "raping [her] from" the time when she was eight-years old to when she was thirteen-years-old. N.T. Trial, 3/4/24, 110-11. Appellant's inappropriate contact with A.W. started with an incident during which he began rubbing his hands against her leg and thigh over her nightgown. *See id.* at 111. He continued rubbing her like that on other occasions and the touching proceeded beyond her leg and thigh. *See id.* He would call the touching, "[h]aving fun," and tell her, "You owe me," for him purchasing toys for her and her sister and taking her to an arcade at a nearby mall. *Id.* at 111-12. A.W. took that to mean that he wanted to force her to have intercourse with him or do inappropriate things with him. *See id.* at 446.

The inappropriate contact progressed to numerous incidents during which A.W. would manually masturbate Appellant. *See* N.T. Trial, 3/4/24, 115-16. He would place her hands "where he wanted [her] to put" them and

"he taught [her] how to do it." *Id.* at 117. She estimated that there were "around 80" masturbation instances and she noted that she would stay at his house "during weeks and[,] every single day [she] would be at his house[,] things would happen."[2] *See id.*

Beginning when A.W. was twelve years old, Appellant would manually penetrate her vagina, causing her "[a] lot of pain" and "[a] lot of tearing." N.T. Trial, 3/4/24, 118. She also estimated that he inserted his penis in her vagina "[o]ver a hundred" times. *Id.* With respect to the manual masturbation and sexual intercourse incidents, she recalled that he would ejaculate into a paper towel or toilet paper. *See id.* at 117, 119. When she would visit Appellant, when he had a separate apartment, which would happen "[m]ost every week," A.W. asserted that vaginal intercourse or manual masturbation with him occurred "three times a day every single time [she] was there." *Id.* at 122. She also recalled that his penis came into contact with her mouth and anus.[3] *See id.* She testified at trial that he penetrated her anus with his penis and that was "[a] lot more painful than the front." *Id.*

---

[2] A.W.'s mother explained that A.W. resided with Appellant, among other times, during periods in which the mother's home was infested with black mold and the mother needed to be hospitalized in connection with that infestation. *See* N.T. Trial, 3/4/24, 192-93.

[3] Given a pre-trial ruling on a motion to preclude, *inter alia*, evidence of oral sex, the prosecution did not follow up with questions on direct examination of A.W. alluding to the circumstances of Appellant's penis touching her mouth. *See, e.g.,* N.T. Trial, 3/4/24, 117, 119; *see also id.* at 141-43, 147, 152-53 (related cross-examination); *id.* at 149-51 (related redirect examination).

at 119. She noted that vaginal penetration started when she was around twelve years old, and anal penetration started when she was around thirteen years old. *See id.* at 120 (estimating that he penetrated her anus with his penis eighty times). She testified that the last time she could recall that he inappropriately touched her or penetrated her was three months before she reported the abuse. *Id.* at 122-23, 146.

Appellant told A.W. not to tell anyone about what was going on between them, remarking that otherwise, she "wouldn't have a dad anymore." N.T. Trial, 3/4/24, 124. He also told her that, otherwise, "[e]veryone would hate [her, and] he would hurt [her] mom." *Id.* He talked to her about not telling others "[m]ore than one time." *Id.*

In March to April 2019, A.W. underwent a three-week stay at a psychiatric facility, the Meadows, following a suicide attempt. *See* N.T. Trial, 3/4/24, 128, 130, 197. During a visit at the Meadows, Appellant rubbed A.W. up and down the inner part of her thigh. *See id.* at 132. Based on information A.W.'s mother received from the staff of the facility, informing her that A.W. was "sexually harassed in the Meadows" by Appellant, A.W.'s mother obtained a protection from intimidation order against him. *Id.* at 197-98. After A.W.'s release from the Meadows, she disclosed the abuse to her mother. *See id.* at 130-31. Her mother asked her if Appellant had touched her at all and she pointed to her lower thigh "and then right after that[, they] went down to the [Altoona Police Department]." *Id.* at 131. A.W.'s mother recalled A.W. telling

her that Appellant was "doing sexual stuff to her," and A.W. saying that "he was on top of her and he would not let her go pretty much." *Id.* at 201.

On the evening of April 17, 2019, a 911 call center transferred a call from the victim's mother to Altoona Police Officer Eric Stirk. *See* N.T. Trial, 3/4/24, 76, 90. The mother reported that her thirteen-year-old daughter had been sexually abused. *See id.* The officer asked the mother to come to the police department, and the mother and A.W. arrived there within fifteen to twenty minutes. *See id.* Officer Stirk directed them to an interview room and recorded some basic information about them. *See id.* at 77. Based on the victim's disclosures, Officer Stirk contacted ChildLine, a mandated statewide child protective services program. *See id.*; *see also* Pennsylvania Department of Human Services Website, "Report Child Abuse," available at www.pa.gov/agencies/dhs/resources/keep-kids-safe/report-child-abuse. The victim's mother informed Officer Stirk that, within two days, the victim had been released from the Meadows psychiatric institution, and, in a following discussion, the victim had disclosed to her that "there had been some abuse." N.T. Trial, 3/4/24, 78. The mother indicated to Officer Stirk that "[t]here had been some allegation while [A.W.] was at the Meadows" such that she "had been inappropriately touched" by Appellant, and Appellant and A.W. had been "sleeping in the same bed." *Id.* at 82-83, 88. A.W. told Officer Stirk that "she took care of [Appellant's] man needs." *Id.* at 88.

Detective Sergeant Terry Merritts[4] subsequently spoke with A.W.'s mother, and they agreed to schedule a forensic interview of A.W. *See* N.T. Trial, 3/4/24, 202-03; N.T. Trial 3/5/24, 59-60. That interview took place, the next day, at the Children's Advocacy Center of Blair County (CAC). *See* N.T. Trial, 3/5/24, 24, 29-30. During the forensic interview, A.W. disclosed that she had been "helping [Appellant] with his man needs and sexual content," referring to "handjobs, that he tried to kiss her, he would rub her thigh, anal sex, [and] vaginal sex." *Id.* at 32. She also disclosed that the described sexual acts occurred repeatedly. *See id.* at 33. In the course of the interview, A.W. volunteered to draw Appellant's penis, referring to it as "his man part or his bottom man part." *Id.* at 35. The interview lasted between 75 and 80 minutes. *See id.* at 36.

Detective Merritts observed the forensic interview from another room. *See* N.T. Trial, 3/5/24, 61, 112. Afterwards, he left a voicemail for Appellant and went to Appellant's home but was unable to contact him. *See id.* at 62, 113. Toward the end of his shift, Detective Merritts was notified that Appellant had gone to a police station to speak with him. *See id.* Detective Merritts went to the police station where he informed Appellant of his *Miranda*[5] rights and had Appellant execute a written acknowledgement of those rights. *See*

---

[4] For the sake of brevity, we will simply refer to the "detective sergeant" as "Detective Merritts" or "detective."

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

*id.* at 63-66.  Detective Merritts then conducted an interview with Appellant.

*See id.* at 66.  In an incident report, Detective Merritts included aspects of his initial conversation with Appellant that proceeded to a recorded statement from the interview.  *See id.* at 69-70.

At trial, Detective Merritts identified "a lot of unusual, unsolicited statements" from Appellant that he described as follows:

> [Appellant] referenced the fact that he has some type of disorder where he will be sleeping and[,] while he's sleeping[,] he'll get strong sexual urges[,] and he'll wake up and he'll find himself engaged in some type of sexual activity with whatever female is with him at the time.  He brought up the fact that he enjoys anal sex.  He brought up the fact that he felt that [A.W.'s mother] was jealous [of A.W.] because [A.W.] had nicer breasts than her or bigger breasts than her.

N.T. Trial, 3/5/24, 70.  Appellant presented Detective Merritts with paperwork concerning a custody dispute between himself and A.W.'s mother.  *See id.* at 73.  Detective Merritts informed him that A.W. had a forensic interview at the CAC, explaining both what the CAC and a forensic interview were.  *See id.*  At trial, Detective Merritts described Appellant as "physically sweating" and "shaking," during that discussion, such that the detective "could physically see his heart palpitating through his shirt."  *Id.*  Appellant "started to belch and gasp and started to wail and cry."  *Id.*  As the detective detailed A.W.'s allegations, Appellant proceeded to "throw up multiple times."  *Id.*  Anytime the detective "would really start to address the allegations directly," Appellant "would get the belching [and] the gasping," and started "spitting in [a] trashcan that he had thrown up in."  *Id.* at 74.

- 7 -

In addition to bringing up the "sleep sex" allegation, in which he asserted that he would supposedly start sexual activity without knowing it, Appellant informed the detective that, while he was a delivery driver for a florist, "he would randomly get [] powerful sexual urges that would require him to pull over alongside of the road and go into the woods and relieve himself" by engaging in public masturbation "until the urges subsided." N.T. Trial, 3/5/24, 74.

At trial, Detective Merritts agreed that, before and after the recorded statement, Appellant did not claim that A.W.'s allegations were false. **See** N.T. Trial, 3/5/24, 75-76; **see also id.** at 80 ("Q. Did [Appellant] ever deny committing these assaults? A. Not once."). Moreover, he agreed that, during the statement, Appellant did not "suggest that th[e] disclosure by [A.W.] was fabricated to impact an ongoing custody battle with" A.W.'s mother. **See id.** at 76. Under cross-examination, the detective confirmed that Appellant said he did not recall asking A.W. to masturbate him, having vaginal or anal intercourse with A.W., or fondling A.W.'s genitals with his hands. **See id.** at 98-99. In any event, Appellant expressed to the detective that he "really wanted custody of" A.W. and boasted that A.W.'s biological father "was on board for it," referring to the fact that he had paperwork there with him and alleging that the biological father would petition the court on his behalf so he could have custody of A.W. **See id.** at 76.

Appellant admitted to the detective that there had been a time in which he "had an erection with his pants down and his penis exposed in front of"

A.W. N.T. Trial, 3/5/24, 77. Later on in the interview, the detective asked, "[Y]ou said you have woken up and your penis has been in a state of erection," and Appellant responded, "[Y]eah, many, many, many, many times with and without [A.W.] being there." *Id.* After the conclusion of the interview with Appellant, Detective Merritts began to compile a criminal complaint that initiated the instant criminal matter. *See id.* at 84-86, 113-14.

After a determination that Appellant would be taken into police custody, Officer Dusten Thompson, who was also present for the interview, escorted Appellant to an intake room to record information from him. *See* N.T. Trial, 3/5/24, 124. During their interaction, Appellant told Officer Thompson, "I did it." *Id.* at 125. To clarify the statement, Officer Thompson asked him if he was saying that in reference to "the allegation that the detective was asking about the assault," and Appellant replied again, "I did it." *Id.* Officer Thompson asked Appellant if he wanted him to go get Detective Merritt to speak with him further and Appellant responded, "I don't know. That's fine. I did it. I don't remember the details." *Id.*

Officer Thompson then placed Appellant in a holding cell. *See* N.T. Trial, 3/5/24, 126. Officer Thompson informed Detective Merritts about Appellant's admission. *See id.* A short time later, Officer Thompson noticed on a video monitor that Appellant had removed his shirt, wrapped it around his neck, and began to twist it tightly in what appeared to be an attempt to kill himself. *See id.* at 127. Officer Thompson and another officer stopped Appellant and

removed all the clothing from him that he could use to harm himself. *See id.* They then notified a shift commander about the incident. *See id.*

A short while later, during which Officer Thompson continued to monitor Appellant, he noticed that Appellant had his head inside the holding cell's toilet with his face below the toilet's water line in another attempt to kill himself. *See* N.T. Trial, 3/5/24, 127-28. Officer Thompson again acted to stop Appellant. *See id.* at 128. Appellant was then referred to UPMC Altoona Hospital for a medical and psychiatric evaluation. *See id.*

Police Officer Christy Wasser accompanied the ambulance that transported Appellant to the hospital. *See* N.T. Trial, 3/5/24, 133. Upon arrival, another officer asked Officer Wasser "what [Appellant] was being brought up for." *Id.* at 135. Officer Wasser said that Appellant had made some statements "admitting to sexually assaulting children." *Id.* While in a hospital room, Appellant spontaneously made a statement to Officer Wasser and hospital staff that "he wanted it to be clear that it was only one child, not children," like Officer Wasser had indicated. *Id.* at 135-36.

On September 22, 2023, Appellant filed a motion in *limine*, seeking to exclude evidence of the statement he gave to Detective Merritts. He alleged that the statement was inadmissible because: (1) it constituted hearsay; (2) the statement did not qualify as a statement against interest pursuant to the hearsay exception under Pennsylvania Rule of Evidence 804(b)(3); (3) the statement referenced a protection from intimidation action against him by the victim, which he asserted constituted inadmissible prior bad acts evidence

- 10 -

prohibited by Pennsylvania Rule of Evidence 404(b)(2); and (4) Pennsylvania Rule of Evidence 403 rendered the statement inadmissible because its probative value was outweighed by "the danger of one or more of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Motion in *Limine*, 9/22/23, ¶¶ 2-5. In support of the motion, he asserted:

> The statement … included an assertion or assertions by [Detective] Merritts of the Altoona Police Department that the alleged victim … had passed a polygraph test, and [Appellant's] statements are predicated upon and/or caused by the assertion or assertions by [Detective] Merritts … that the alleged victim … had passed a polygraph test, which vitiates the admission of the whole of the statement …, and [Appellant] will suffer undue prejudice if such evidence were to be admitted.

*Id.* at ¶ 4.

On March 1, 2024, three days prior to the start of trial, Appellant filed a motion seeking to preclude the Commonwealth from admitting additional evidence referenced in correspondence sent to counsel on February 29, 2024. *See* Motion for Relief, 3/1/24, ¶¶ 2-3, 7-8. In the event that the court did not preclude the evidence, Appellant asked for a continuance in the alternative "to gather evidence that could amount to a defense to … new allegations." *Id.* at 5. Appellant's motion did not identify the additional evidence that was referenced in the prosecutor's correspondence and just referred to it as follows: "The Commonwealth had more than 3 years to produce these witnesses and the statements being sought for admission at trial. This new disclosure alleges new crimes and offenses which would normally entitle

[Appellant] to a preliminary hearing and at least an opportunity to investigate and prepare a defense." *Id.*

Before the first day of trial, Appellant's counsel explained that he objected to evidence concerning "interviews with Melissa Marlett" (the fiancée of the victim's father), involving the presence of a "victim witness director," and allegations that [] Marlett overheard Appellant "make some admissions over the phone." N.T. Trial, 3/4/24, 4, 99. After the prosecutors confirmed that Marlett would not be presented as a witness, Appellant's counsel shifted the focus of the motion to the content of the prosecutor's correspondence including its references to acts of oral sex not previously addressed in the victim's CAC interview:

> Basically, [the prosecutor is] indicating for the first time that now there was allegations that [Appellant] had required [A.W.] to perform oral sex numerous times and it's indicated that this happened numerous places. Numerous residence[s], including in his vehicle. She also indicated that this happened over a long period of time and went into the – she was 12 or 13 years of age when this occurred.

*Id.* at 5. The Commonwealth agreed that it was not seeking a conviction on any charges based on the allegations of oral sex contained in the letter and that it did not intend to ask questions about oral sex incidents and agreed that it would "move on" if the victim's testimony commented on it in "an unresponsive way." *See id.* at 7-8; *see, e.g., id.* at 7 ("The Commonwealth certainly does not intend to rely on the allegations of that particular act of oral sex as a basis for conviction in any of the charges that we've brought."); *id.*

at 8 ("I certainly don't intend to ask did any acts of oral sex happen."). With the implicit agreement of the parties concerning the Commonwealth's intention not to elicit testimony about the oral sex content of the prosecutor's letter, the court did not render a ruling on this part of Appellant's motion. *See id.* at 9.

With respect to the remaining contents of the letter, Appellant's counsel did not directly address or explain any of the information included and asked for a continuance if the court decided to admit the evidence addressing those unidentified matters:

> [Appellant's counsel]: Your Honor, there are some more specific things that obviously[,] now[,] if we had been disclosed this and had --- would have more time we believe we could have investigated these things. We could counter some of these allegations. That's why in the, you know, we would be asking not only for the court to exclude but for a continuance to give us some time to investigate these new allegations. And that's the reason why we would ask that they be kept out. []

N.T. Trial, 3/4/24, 10-11. After some questions posed by the court, counsel admitted that the information did not "change the nature of the defense," but asserted that if the defense "had this some time ago [it] could have … punch[ed] some holes in it and attempted to find some witnesses and dates." *Id.* at 11. When the court asked for an example of how earlier disclosure would have affected the defense's investigation, counsel declined to offer any example:

> Well, I'd rather not reveal that, Your Honor, in the event that we could still maybe try. All due respect to the court, the court to try to salvage that during --- I think the court has this trial scheduled

for a week or at least four or five days and I would rather not get into those specifics. We're going to try to attempt to do some of that as best we can.

*Id.* at 11-12. The court denied counsel's request for preclusion or a continuance. *Id.* at 12 ("Any request for preclusion or for a continuance for the reason outlined are denied. … The court denies the motion[,] and this is based on the Commonwealth's assertions that they are not going to call … the one witness and that they are not going to directly elicit the testimony contained in that letter about oral sex.").

As for Appellant's pending motion in *limine* seeking the exclusion of his own statement to Detective Merritts because the detective allegedly told him the victim had passed a polygraph test, the Commonwealth argued that it believed testimony from the detective would contradict Appellant's claim and that the motion in *limine* should be treated as an untimely suppression motion. *See* N.T. Trial, 3/4/24, 18. The court did not issue a pre-trial ruling on Appellant's motion, instead choosing to issue a ruling on it prior to the presentation of testimony from Detective Merritt, scheduled for the second day of the trial. *See id.* at 21, 23.

At trial, the Commonwealth presented testimony from: A.W.; A.W.'s mother; Detective Merritts; Officer Stirk; Officer Thompson; Officer Wasser; an expert in child forensic interviewing, who was the director of the CAC and conducted the forensic interview of A.W. (Ashley Owens); a pediatrician who performed a forensic medical examination of A.W. (Dr. Kristie Kaufman); and an expert witness on forensic psychiatry (Dr. Barbara Ziv). The

Commonwealth played portions of A.W.'s forensic interview at the CAC for the jury and presented the jury with, *inter alia*, copies of the drawings made by A.W. during her forensic interview. ***See*** N.T. Trial, 3/5/24, 37-40, 42-46, 54-55. The Commonwealth also played portions of Appellant's recorded statement to Detective Merritts. ***See id.*** at 72. Appellant declined to testify or present any witnesses. ***See*** N.T. Trial, 3/6/24, 54-61.

After the presentation of testimony from A.W. and Officer Stirk, and before testimony from A.W.'s mother, Appellant's counsel objected to the admission of information about the victim "cutting herself at age nine" or "anything related to [the victim's treatment at] the Meadows" facility, including the testimony about inappropriate touching at the facility, arguing that the evidence would constitute prejudicial hearsay. N.T. Trial, 3/4/24, 172-74. The court offered to grant a limiting instruction with respect to that evidence, in lieu of precluding the evidence, which counsel declined to accept at the time, wishing to see how the trial would play out. ***See id.*** at 178-79. The court thus deferred issuing a "ruling on this cutting thing" until later. ***Id.*** at 180.

After the conclusion of the first day of trial, the court returned to consideration of Appellant's motion to preclude his statement to Detective Merritts. ***See*** N.T. Trial, 3/4/24, 233. Appellant's counsel asserted that Appellant's statement was "totally predicated on some indication on some truths here or some truth test that was given that show[ed] that [A.W.] was accurate in what she said." ***Id.*** at 236. Counsel asserted that the statement

was "highly prejudicial" because it would suggest to the jury that "there [was] a polygraph test that was given" and that test made it appear that A.W. gave accurate responses. *Id.* at 236. The court then heard testimony from Detective Merritts, outside the presence of the jury, on the statement he took from Appellant.

Detective Merritts asserted that there was no polygraph test performed on the victim and that he had told Appellant that A.W. "was in a forensic interview at the CAC." *See* N.T. Trial, 3/4/24, 247. He confirmed that he explained to Appellant multiple times what a forensic interview was and Appellant chose to give a statement:

> [DETECTIVE MERRITTS]: … I probably explained to him three or four times what a forensic interview was and as he continued down that path as some type of test and it seemed to be bothering him, I just let him go. It is not my responsibility to correct him at that point. He was advised of his rights, he was not in custody, he co[u]ld have walked away anytime. No one was holding him hostage and we continued with the line of questioning.
>
> * * *
>
> [E]arlier on I said there was a test, this was a forensic interview as I explained to the court how I would explain it to someone that is what I told him. For whatever reason he was not grasping that concept, he viewed it in a different manner, I do not know what - -- I do not know what he was thinking but I was not going to revisit that over and over an[d] over again because it was taking away from the line of questioning [regarding] did you or did you not do this.

*Id.* at 248-49.

The court denied Appellant's motion, but stated it would give further consideration to the motion with respect to references to an act of violence and potential drug use:

> [TRIAL COURT]: We've read the entire written statement. We've heard the testimony of the detective sergeant. We find the detective sergeant['s] testimony credibl[e] in all respects. The court sees no basis for granting the motion in *limine* or for its exclusion of the statement. […] We think the nature of [Appellant's] statement is highly probative under the circumstances of the case and for that reason the court declines to grant the [] motion in *limine*. Having said that[,] the court is slightly inclined to think any reference to a violent act or possible drug use perhaps is probative so the court is going to look over the statement a little closer and see if there's some way that we wouldn't think that those two references which appear to be relatively slight in the statement couldn't be redacted […] so we are open to further consideration on those two statements. But as far as anything else about falling asleep, all of that stuff [is] admissible.

N.T. Trial, 3/4/24, 272-73.

Following the court's ruling, the prosecution made three redactions to the statement to address the areas the court identified and trimmed the audio recording of the statement consistent with its redactions. **See** N.T. Trial, 3/5/24, 7-10. The court deemed the redactions satisfactory and denied a renewed objection from Appellant's counsel to preclude the admission of the statement in its entirety on the basis that, at the time of the statement, Appellant "had believed that there was a test done on the alleged victim." **Id.** at 10.

Before the start of the second day of trial, the court permitted admission of the recording of the victim's forensic interview, a request that had been

subject to a pre-trial hearing before a different judge but had been left outstanding. *See* N.T. Trial, 3/5/24, 11-12. The court acknowledged that it directed some redactions and counsel had worked together with the prosecutor to redact portions of the interview that were irrelevant. *See id.* Appellant's counsel then renewed a prior objection to the ruling that the recording would be admitted "under the Tender Years Exception." *Id.* at 12. In the alternative, Appellant's counsel asked that only some portions of the interview be admitted as prior consistent statements. *See id.* The court noted the objection, implicitly declining to reconsider its admissibility ruling. *See id.*

When portions of the forensic interview recording were played for the jury, Appellant's counsel requested the court to strike references in it about suicide. *See* N.T. Trial, 3/5/24, 41. The prosecution characterized the content as A.W. expressing, "I want to try to repair my relation with my gram because my gram told me I'm basically not welcome anymore because my gram doesn't understand why I've been suicidal and my gram doesn't understand that mostly the reason I'm suicidal is because of this. It's in my head." *Id.* at 41. The prosecution argued that the suicidal references were relevant as they demonstrated A.W.'s state of mind at the time of the interview. *Id.* Appellant's counsel objected to the admission of that portion of the recording as improper and prejudicial. *Id.* at 42. The court overruled the objection. *Id.*

Appellant's counsel principally argued in closing that: (1) A.W.'s testimony was not credible, *see* N.T. Trial, 3/6/24, 77-85, 92-93; (2) she fabricated her testimony because he was involved in a custody dispute with her mother concerning her sister, *see id.* at 81, 93; (3) Appellant's police statement was influenced by his belief that A.W. had passed a lie detector test, *see id.* at 87-90, 94; and (4) Appellant's statements were not inculpatory in that he was merely suggesting, in his statement to Detective Merritts, an explanation for how the abuse may have occurred and, in his statement to Officer Wasser, was simply correcting the number of accusers against him, *see id.* at 89-92, 94. On March 6, 2024, the jury found Appellant guilty of the above-refenced offenses.[6] *See* Verdict, 3/6/24, 1-6; N.T. Trial, 3/6/24, 159-61.

On July 23, 2024, the trial court sentenced Appellant to an aggregate imprisonment term of forty-seven and one-half to ninety-five years, to be followed by thirty-six months of reentry supervision. *See* Order (sentencing), 7/23/24, 1-17. Appellant timely filed a *pro se* notice of appeal. *See Pro Se* Notice of Appeal, 8/5/24, 1. Trial counsel subsequently filed a motion to withdraw from representation of Appellant. *See* Motion to Withdraw Appearance, 8/9/24, 1-2. On October 18, 2024, the trial court granted trial

_____

[6] During the trial, Appellant declined a plea offer whereby Appellant would enter an open guilty plea to single counts of rape, IDSI, and endangering the welfare of children, and the Commonwealth would withdraw the remaining charges. *See* N.T. Trial, 3/5/24, 141-47 (declination of plea offer colloquy).

counsel's withdrawal motion and appointed the Blair County Public Defender's Office as appellate counsel for Appellant. *See* Order (granting motion to withdraw appearance and appointing new counsel), 10/18/24, 1-2.

The trial court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925. *See* Order (Pa.R.A.P. 1925), 10/30/24, 1. While Appellant requested, and was granted, an extension of time to file the ordered statement, no statement pursuant to Rule 1925(b) was filed or included in the record certified for this appeal. *See* Motion to Extend Deadline for 1925(b) Statement, 11/7/24, 1; Order (granting motion to extend deadline for 1925(b) statement), 11/15/24, 1. On February 24, 2025, the trial court filed an opinion in response to a Rule 1925(b) statement that the court received and referred to as having been filed on October 31, 2024. *See* Trial Court Opinion, 2/24/25, 2.

Appellant presents the following questions for our review:

I. Whether Appellant's recorded statements to police were unfairly prejudicial[?]

II. Whether [the] complainant's recorded hearsay statements were unfairly prejudicial[?]

III. Whether Appellant was prejudiced by [the] denial of a continuance[?]

Appellant's Brief, 4 (unnecessary capitalization and suggested answers of the trial court omitted).

Preliminarily, we must address the circumstances surrounding whether Appellant, while represented by counsel, satisfied his obligations under Rule

1925(b). Here, the trial court states that Appellant "filed a Concise Statement of Matters Complained of on Appeal per the Rule of Appellate Procedure 1925(b)." Trial Court Opinion, 2/24/25, 2. The trial court docket, however, does not include an entry indicating the filing of any such statement and the record certified for our review does not include a copy of a filed Rule 1925(b) statement, suggesting – contrary to the trial court's characterization – that no Rule 1925(b) statement was actually filed. If counsel had merely served the statement on the trial court and did not file it, as ordered to do so, a failure in that regard would constitute *per se* ineffectiveness, and we could remand under Rule 1925(c)(3). In this instance, we decline to do so because the trial court addressed in its Rule 1925(a) opinion the issues Appellant seeks to raise on appeal. ***See Commonwealth v. Burton***, 973 A.2d 428, 433 (Pa. Super. 2009) (*en banc*) (declining to remand based on Burton's filing of an untimely Rule 1925(b) statement where the trial court had an adequate opportunity to prepare an opinion addressing the issues raised on appeal).

In his first two issues, Appellant challenges the denial of his motions in *limine* to preclude statements made by himself to Detective Merritts and by the victim in the recorded forensic interview at the CAC. ***See*** Appellant's Brief, 8-10. Our well-settled standard of review for evaluating claims of this nature is as follows:

> Admission or exclusion of evidence at trial rests within the discretion of the trial court. We will not reverse the trial court's decision absent an abuse of that discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is

- 21 -

manifestly unreasonable, or the result of bias, prejudice, ill-will[,] or partiality, as shown by the evidence of record. If[,] in reaching a conclusion[,] the trial court overrides or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error.

***Commonwealth v. Williams***, 91 A.3d 240, 242 (Pa. Super. 2014) (*en banc*) (internal quotation marks and citations omitted).

In his first issue, Appellant asserts that the trial court abused its discretion by admitting the contents of his statement to Detective Merritts "because [he] believed that the victim referenced in the interview had been subject to a polygraph exam." Appellant's Brief, 8. He reasons that the admission of the statement resulted in unfair prejudice since it allowed "his expression of uncertainty [to be] framed as an admission of guilt." ***Id.*** He argues that the statement instead "amounted to [a] lack of memory, rendering them likely to confuse the jury." ***Id.***

The trial court, in its Rule 1925(a) opinion, stands by its admissibility ruling and informs us:

The statement itself was highly probative. Certain irrelevant portions of the statement were not actually presented to the jury. Regarding the "polygraph test[,]" this [c]ourt stands by our conclusion that there was no credible evidence that [Appellant] was informed [that] the [v]ictim passed a polygraph examination or even took such [a] test.

Trial Court Opinion, 2/24/25, 2-3 (unpaginated).

When Appellant originally challenged the admissibility of his statement to police, his claim was based on the unfounded assertion that Detective Merritts had compelled the statement by deceptive means by leading

- 22 -

Appellant to believe the victim had taken and passed a polygraph test. **See,
e.g.**, N.T. Trial, 3/4/24, 234 (Appellant's counsel: "we believe if you look at
the statement as a whole in its entirety that it would show there is some
indication made to [Appellant] prior to giving a recorded interview that [the
victim] was given a test [that] showed that it was accurate that she was telling
the truth"). Detective Merritts testified that a polygraph test had never been
administered with respect to this case, he had explained to Appellant that
A.W. had a forensic interview, and he repeatedly explained to Appellant what
a forensic interview was. **See id.** at 247-48.

Detective Merritts made clear that, to the extent he used the word
"test" with Appellant, he was only referring to the forensic interview and that
he continued on with his interview of Appellant even though it was clear that
Appellant believed that a polygraph test had been performed:

> [DETECTIVE MERRITTS]: … [E]arlier on[,] I said there was a test,
> this was a forensic interview and[,] as I explained to the court[,]
> how I would explain it to someone[,] that is what I told him. For
> whatever reason[,] he was not grasping that concept, he viewed
> it in a different manner, I do not know what --- I do not know
> what he was thinking[,] but I was not going to revisit that over
> and over an[d] over again because it was taking away from the
> line of question [regarding] did you or did you not do this.

N.T. Trial, 3/4/24, 249. To the extent that Appellant asserted that the
detective had improperly deceived him, the trial court denied that claim when
it found the detective's testimony to be credible. **See id.** at 272. The court
otherwise held that confusion on Appellant's part did not render the admission
of the statement to be prejudicial:

THE COURT: … We don't think this issue about referencing a test or detection or whatever it was from the defendant should serve as a basis for excluding the statement. It appears to be something he got in his head. It doesn't appear to be the truth. I think it can be dealt with during cross examination or during the presentation of other evidence. The court doesn't find [that admission of the statement would be] over[ly] prejudicial.

*Id.*

Upon our review of the record, we do not find that the court erred or abused its discretion by determining that the admission of the statement to the detective would not have resulted in unfair prejudice. As we have previously noted, "[e]vidence will not be prohibited merely because it is harmful to the defendant." ***Commonwealth v. Page***, 965 A.2d 1212, 1220 (Pa. Super. 2009) (citation omitted). Exclusion of evidence on the grounds that it is unfairly prejudicial "is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." ***Commonwealth v. Foley***, 38 A.3d 882, 891 (Pa. Super. 2012).

Here, Appellant appeared to be confused about the circumstances of the victim's forensic interview, despite numerous correct explanations by the detective that should have allayed his confusion, and nonetheless proceeded with the interview. "[T]he Pennsylvania Supreme Court has found confessions to be voluntary even in cases where the police made intentional misrepresentations, so long as the remaining circumstances suggest the confession was voluntary." ***Commonwealth v. Roberts***, 969 A.2d 594, 600

(Pa. Super. 2009). Appellant makes no attempt to argue that confusion on his part rendered his statement involuntary. Rather, he argues that admission of the statement was prejudicial because his alleged confusion rendered his statement susceptible to different interpretations. In the circumstances presented, we agree that the trial court acted within its discretion to admit into evidence the statement and the jury would properly act as the ultimate fact-finder on the credibility or interpretation of Appellant's statement.

To the extent that Appellant suggests the jury was likely to be confused by the statement, we note that Appellant's counsel pursued cross examination of Detective Merritts at trial, which specifically addressed Appellant's apparent confusion and the detective admitted that Appellant might have been confused about the forensic interview because he kept referring to it as a test. *See* N.T. Trial, 3/5/24, 101. As the questioning and testimony of the detective properly offered the jury the appropriate context to understand that different interpretations could be made with respect to Appellant's statement, we do not find that unfair prejudice resulted from the trial court's admission of the statement. Accordingly, no relief is due on Appellant's first issue.

In his second issue, Appellant asserts that the trial court abused its discretion by admitting portions of the recording of A.W.'s forensic interview that included "unfairly prejudicial statements." Appellant's Brief, 9. In particular, he notes that "the victim's statements regarding suicidal ideation, specifically, did not speak to the elements of any of the charged offenses, but were nonetheless admitted to demonstrate [A.W.'s] state of mind." *Id.* He

argues that the statements about suicidal ideation posed a "danger of unfair prejudice" because they "did not speak to the elements of the sexual offenses" and points out that "the fact for the jury to decide was not how [A.W.] felt about what had happened between her and [him], but specifically what had happened between her and [him]." *Id.* at 10.

Beyond baldly alleging that unfair prejudice resulted from the admission of the portions of the CAC interview delving into the issue of suicidal ideation, Appellant does not point us to any relevant case law suggesting that the evidence in question was improperly admitted. He simply argues that the evidence reflecting the victim's suicidal ideations during the alleged period of abuse was irrelevant and thus its admission was prejudicial. We disagree that this evidence was irrelevant.

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. Among the charges that Appellant faced at trial was endangering the welfare of children. The evidence at issue, here, was an assertion by the victim that the abuse by Appellant contributed to her feeling suicidal. *See* N.T. Trial, 3/5/24, 41. Our three-part test for determining the sufficiency of the evidence for endangering the welfare of children requires proof that "the accused is aware that the child is in circumstances that could threaten the child's physical or psychological welfare." *Commonwealth v. Pahel*, 689 A.2d 963, 964 (Pa. Super. 1997) (citation omitted). Accordingly, where the sexual abuse of the victim had the

effect on the victim's mental health to cause her to be prone to suicidal ideation, evidence of that ideation is probative of the ultimate fact that the victim's psychological welfare was being threatened by Appellant.

Expressions of suicidal feelings or attempts to act upon them, like the evidence at issue, directly address the element of endangering the welfare of children regarding whether Appellant had awareness that A.W. "was in circumstances that could threaten [her] psychological welfare." ***Pahel***, 689 A.2d at 964. Independent of the trial court's determination that the suicidal ideation evidence was admissible to show the victim's state of mind at the time of her CAC interview, it was directly relevant for purposes of the child endangerment charge because the evidence made it more probable that Appellant was aware that A.W. was in circumstances that could threaten her welfare and that Appellant thereby violated a duty of care to A.W. by continuing the abuse that caused those ideations. Contrary to Appellant's instant claim, we conclude that the statements about suicidal ideation directly related to the elements of at least one of his charges and thus were admissible as relevant evidence. On this basis, we conclude that the trial court did not abuse its discretion by admitting the portions of the CAC interview recording addressing the victim's suicidal ideations.[7] Thus, no relief is due on Appellant's second issue.

---

[7] "To the extent our legal reasoning differs from the trial court's, we note that, as an appellate court, we may affirm on any legal basis supported by the
*(Footnote Continued Next Page)*

- 27 -

In his last issue, Appellant asserts that the trial court abused its discretion when it denied his request for a pre-trial continuance "based on his receipt of a letter written by a witness addressed to the District Attorney's office the weekend before trial." Appellant's Brief, 10. He neither addresses the identity of the person who drafted the letter that supposedly compelled his continuance request nor explains the content of that letter but only alleges that he had "insufficient time to investigate facts learned following receipt of discovery mere days before trial, namely, a letter from a witness." *Id.* at 10-11. He argues that

> the trial court's remedy of excluding the late discovery did not cure the prejudice of proceeding to trial without the necessary time to: [(1) i]nvestigate further based on [the letter's] contents; and [(2) p]repare cross examination materials, contact any potential defense witnesses and prepare their direct testimony, and counsel [Appellant] on whether to testify at trial or remain silent.

*Id.* at 11.

> Our standard of review for the denial of a continuance is as follows:
>
> Appellate review of a trial court's continuance decision is deferential. The grant or denial of a motion for continuance is within the sound discretion of the trial court and will be reversed only upon a showing of an abuse of discretion. As we have consistently stated, an abuse of discretion is not merely an error of judgment. Rather, discretion is abused when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record.

certified record." **Commonwealth v. Smith**, 194 A.3d 126, 138 (Pa. Super. 2018) (citation omitted).

***Commonwealth v. Brooks***, 104 A.3d 466, 469 (Pa. 2014) (internal quotation marks and citation omitted).  The refusal to grant a continuance "is reversible only if prejudice or a palpable and manifest abuse of discretion is demonstrated."  ***Commonwealth v. Hansley***, 24 A.3d 410, 418 (Pa. Super. 2011).

With respect to the denial of Appellant's continuance request, the trial court notes the following in its opinion:

> In regards to the continuance request, due to [Appellant] learning of the existence of a letter dated February 29th shortly before trial, [Appellant] was asked to articulate how the letter would be prejudicial to the nature of [Appellant's] defense or would otherwise alter the defense, and [Appellant] was unable or refused to provide any details.  [Appellant] averred that they would use the time to find witnesses and dates to "punch holes" in the new evidence, but when asked to give an example of such [he] refused to elucidate.

Trial Court Opinion, 2/24/25, 3 (unpaginated).

After our review, we discern no abuse of direction and conclude that the record aligns with the court's recollection of the events surrounding the denial of a continuance.  At the time of the request, Appellant's counsel failed to address any information specified in the proffered letter, only generally referring to "allegations" contained in it:

> [Appellant's counsel]:  Your Honor, there are some more specific things that obviously[,] now[,] if we had been disclosed this and had --- would have more time we believe we could have investigated these things.  We could counter some of these allegations.  That's why in the, you know, we would be asking not only for the court to exclude but for a continuance to give us some time to investigate these new allegations.  And that's the reason why we would ask that they be kept out.  []

N.T. Trial, 3/4/24, 10-11. Counsel also admitted that the information in the letter did not "change the nature of the defense," but asserted that if the defense "had this some time ago [it] could have … punch[ed] some holes in it and attempted to find some witnesses and dates." *Id.* at 11. When the court asked for an example how earlier disclosure would have affected the defense's investigation, counsel declined to offer any example:

> Well, I'd rather not reveal that, Your Honor, in the event that we could still maybe try. All due respect to the court, the court to try to salvage that during --- I think the court has this trial scheduled for a week or at least four or five days and I would rather not get into those specifics. We're going to try to attempt to do some of that as best we can.

*Id.* at 11-12.

At the time of the continuance request, Appellant failed to state any specific reasons for the court to believe that any additional time for investigation would have changed his preparation for trial and appeared to decline to make any proffer of prejudice as a matter of trial strategy. Armed now with hindsight from the trial and even acknowledging that he bore the burden to forward a proper reason for a continuance, he still fails to articulate any specific grounds for concluding that late discovery of some non-descript letter prejudiced him or that additional time would have been useful for developing a better defense for trial. *See* Appellant's Brief, 10-11. In these circumstances, we are unable to conclude that the trial court abused its discretion by denying his vague and unsupported request for a pre-trial continuance. *See **Brooks**, 104 A.3d at 477 ("there is some force to the []

argument on appeal that the burden is upon the party requesting a continuance to support that request; the trial court does not have an obligation to assume that the request must be granted, and then probe the [requesting] party"). Accordingly, no relief is due on Appellant's final issue.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 3/31/2026